Phelps *vs.* The State of Georgia.

---

## PHELPS *vs.* THE STATE OF GEORGIA.

75 571
118 764

1. The verdict was fully sustained by the evidence.
2. When taken in connection with the entire charge of the court, including the charge on the subject of reasonable fears, there was no error in charging that "if Daniel (the deceased) was cursing Phelps (the defendant), and called for his pistol, and Phelps pulled his pistol out and shot him, that would not reduce the crime from murder to manslaughter."
3. There was no error in refusing a continuance on the ground of the absence of a witness just heard of on the morning of the trial, who would swear to certain statements of the wife of the deceased, it not being shown in any way that the wife would not swear what she had stated to the witness.
4. When the jury request the court to re-charge them on any point, it is his duty to do so, and the consent thereto of defendant's counsel is not necessary.

(*a.*) Counsel and the prisoner were present in this case, and no objection was made or exception taken.

(*b.*) There was no error in telling the jury the punishment of the different grades of homicide, especially when it was for them to fix the punishment in one of the grades.

November 17, 1885.

Criminal Law. Charge of Court. Continuance. Practice in Superior Court. Before Judge SIMMONS. Randolph Superior Court. November Adjourned Term, 1884.

Joe Phelps was indicted for the murder of H. J. Daniel. On the trial, the evidence for the state showed, in brief, as follows: Phelps and one Turner went by the house of Daniel about dark in the evening They were talking loudly and cursing. They asked for Daniel. At first, the wife of the latter refused to answer, but finally told them that he was not at home, but had gone to a neighbor's. They then left. In two or three minutes, some one hal-looed and a pistol fired. Daniel's voice was heard crying, "Oh! Lordy!" and calling to his daughter to bring him his pistol. He was found seventy-five or eighty yards from the house mortally wounded. He stated to those who came to him that he heard the loud talking and cursing, and turned back to protect his family; that he met the defendant and Turner; that he stated to them that if they had no more respect for him, they must have for his family; that his wife was sick; and that if they did not cease cursing and disturbing his family, he would prosecute them; and that thereupon the defendant cursed him, drew his pistol and fired on him. He made dying declarations several times, to the effect that the defendant shot him.

On behalf of the defendant, Turner, his comrade, at the time of the shooting, testified, in brief, as follows: They were returning from a place where the defendant had been to collect a debt, and went through the field as a shorter path. No threats or insulting words were used at Daniel's

house. They passed the house, but spoke only to each other. They met Daniel in a path or road leading to the public road. He asked what they were hallooing so loudly about his house for. Turner said he didn't do it. Daniel called him a damned liar, caught hold of him and shook him, then turned him loose, called to his daughter to bring him his pistol, and started towards the house, while the defendant and Turner started to walk on. Daniel went only a short distance, then came back, caught hold of the defendant and threw him "in the edge of the road." Phelps shot him. He then cried, "Oh! Lordy." The witness and the defendant were second cousins; they had been drinking a good deal that night, and had a pint flask of whiskey with them. The defendant was about half tight, and the witness was "just about sober."

Another witness was introduced to show certain statements made by the wife of the deceased when he called for his pistol, etc.

The jury found the defendant guilty, and recommended that he be imprisoned for life. He moved for a new trial on the following grounds:

(1.) Because the verdict was contrary to law and evidence.

(2.) Because the court refused to grant a continuance on account of the absence of a witness just discovered that morning, by whom the defendant expected to show certain statements made by the wife of the deceased, to the effect that the defendant and his comrade did not use any abusive, threatening or insulting language and did not ask where Daniel was.

(3.) Because the court charged as follows: "If Daniel was cursing Phelps, and called to his daughter to bring him his pistol, and Phelps pulled his pistol and shot him, that would not reduce the crime from murder to manslaughter."

(4.) Because, after the jury had retired, they returned to the court-room, and at their request the court charged them as to the different penalties attached to the crime of

manslaughter in its different grades, the defendant or his counsel not consenting thereto.

The motion was overruled, and the defendant excepted.

L. S. CHASTAIN; A. HOOD & SON, for plaintiff in error.

J. H. GUERRY, solicitor general, for the state.

JACKSON, Chief Justice.

1. The plaintiff in error shot deceased with a pistol, which he had concealed upon his person, a short distance from the home of deceased—so near that his voice could be heard calling upon his little daughter, Alice, to bring him his pistol, and so near that his agonizing cry, on being shot, "Oh, Lordy! Oh, Lordy!" was heard by his wife in his house. There are no mitigating circumstances. A flask of whiskey in the pocket of the murderer, and a pistol concealed upon his person, ready for any murderous use, tell the usual tale when one man hurries his neighbor's soul into eternity. These, so far from mitigating, only tend to increase the enormity of the crime. The concealed pistol on the person is a defiance of law, a sort of deliberate preparation beforehand to kill, if he met in any *rencontre*, a fellowman,—an evidence of general disregard of human life and of misanthropic malice towards the race. The flask of whiskey indicates the habitual use of an intoxicating beverage, whose effect is to inflame passion and unhinge reason to the extent that the outlaw, defiant of the prohibition of his country against the carrying of concealed weapons, and bad enough in such defiance, seems unwilling to be governed by the little reason kept cool, which such a man possesses, but appears determined to deprive himself of that little from the flask worn close by the pistol. What can such a man expect but to reach the gallows, unless the mercy of jurors confine him for life in the penitentiary?

Even conceding that the version given of the transac-

tion by the companion of this outlaw be the truth of the case, the murde er shot the deceased when he must have known he was unarmed, for he had not time for the little girl to bring his pistol, and with no provocation, except possibly the call for the pistol and the seizure of his person. That seizure amounted to nothing, for but a moment before he had seized the other and had loosed him without hurting him at all; and of course, the two men could have defended themselves against one without killing that one.

But the jury believed the dying declarations of the deceased, spoken by him where he fell, and within so short a time, and in a place which make the declarations not only the utterance of a dying man, hastening to the bar of judgment, but make the words then spoken acts as part of the *res gestæ;* and those declarations make murder without any provocation at all, from his dying lips, according to what two or three testified they heard him say, and unprovoked, naked, deliberate murder, according to what he narrated with a gasping breath to another who leaned over him to catch his words.

2. The charge of the court, like the usual utterances of Judge Simmons from the bench to the jury, is full, clear and apposite, giving every possible phase of the evidence under the law,—not only fair, but favorable to the plaintiff in error.

The single extract excepted to by his counsel, and made one ground in the motion for a new trial, is, as we think, even standing alone, sound law, but when read with all the rest of the charge on the same subject, it is impossible to detect any shadow of error therein. That extract is, "If Daniel was cursing Phelps, and called for his pistol, and Phelps pulled his pistol out and shot him, that would not reduce the crime from murder to manslaughter." In another part of the charge, the law, in respect to conduct exciting the fears of a reasonable man of serious injury to himself, is fully given.

3. The case should not have been continued on the

ground stated. It was the absence of a witness, just heard of that morning, who would swear to certain statements of the wife of deceased, without showing that the wife would not swear on the stand what she stated to the witness, either by her evidence on the committing trial or otherwise.

4. When the jury request the court to re-charge them on any point, it is the duty of the court to do so, and the consent thereto of defendant's counsel is not necessary. Counsel and prisoner were present, and no objection was made or exception taken. Nor is there error in the court's telling the jury the punishment of different grades of homicide, especially when it is for them to fix the punishment in one of the grades. To act with the absolute power which the law gives the jury judiciously, it is well that they should know, not only all the grades of homicide, but the punishment of each. It does not appear, and therefore did not exist as true, that the judge did not tell them the correct law, and that they had no discretion or right of interference except in murder. Certainly the information given by the court to the jury, at their request, did no harm; for we close with the remark that the plaintiff in error is wonderfully, almost marvelously fortunate, that the verdict spared his life.

Judgment affirmed.