RAYMOND FREDDO *v.* STATE.*

*(Nashville.   December Term, 1912.)*

1. **HOMICIDE.   Evidence held sufficient to show killing under sudden heat of passion.**

The evidence in a prosecution for homicide is stated, reviewed, and *held* to be sufficient to show that the accused killed the decedent under the impulse of a sudden heat of passion. (*Post, pp.* 378-382.)

2. **SAME.   Provocative cause considered on basis of ordinary average mind, and not an abnormal or peculiarly sensitive mind.**

The adequacy of the provocation of a homicide must be tested by considering a mind ordinarily constituted, the fair average mind and disposition, and not an abnormal or peculiarly sensitive mind. (*Post, pp.* 382, 383.)

Cases cited and approved: Seals v. State, 3 Bax., 459, 462; Johnson v. State, 11 Lea, 47; Regina v. Welsh, 11 Cox. C. C., 336; State v. Ferguson, 2 Hill (S. C.), 619 Ryan v. State, 115 Wis., 488.

8. **SAME.   Epithets are not sufficient provocation for taking life, nor to reduce homicide to manslaughter; epithet "son of a bitch" not adequate provocation.**

Mere language or epithets, however violent or offensive, do not constitute sufficient provocation for taking life, nor to reduce homicide to manslaughter; so that the use of the epithet "son of a bitch" would not be adequate cause of provocation. (*Post, pp.* 383, 384.)

Cases cited and app ved:   Williams v. State, 3 Heisk., 376, 392; Levy v. State, 28 Tex. App., 203.

---

*For the question of insulting words or conduct as a provocation to homicide, see note in 4 L. R. A. (N. S.), 154.

As to heat of passion which will mitigate or reduce the degree of a homicide, see note in 5 L. R. A. (N. S.), 809.

Freddo v. State.

4. **SAME. Same. Slight assault accompanied with offensive language may reduce killing to manslaughter, when.**

An assault, too slight of itself to be sufficient provocation to reduce a killing to manslaughter, may become sufficient when accompanied by offensive language; but to do so, the accompanying assault must be imminent or actual. (*Post, pp.* 384, 385.)

Cases cited and approved: Grainger v. State, 5 Yerg., 460; Seals v. State, 3 Bax., 459; Regina v. Sherwood, 1 Car. & Kir., 554; Regina v. Smith, 4 Fos. & F., 1066; State v. Buffington, 71 Kan., 804; Wadlington v. State, 19 Tex. App., 266; Gray v. State, 47 Tex. Cr. R., 375; Golden v. State, 25 Ga., 527; Edwards v. State, 53 Ga., 428; Ex parte Warrick, 73 Ala., 57; Phelps v. State, 75 Ga., 571.

5. **SAME. Same. Same. Whether the assault accompanied by abusive epithet was adequate cause of provocation is for the jury, under a proper charge.**

Where the fatal stroke may have been found by the jury to have been delivered by the accused at a time when the decedent was not in a position to assault him, though the decedent used a highly abusive epithet toward the accused at the time, the determination of the question whether the provocative epithet was accompanied by a sufficient assault to constitute adequate or reasonable cause for arousing the passion of the accused was for the jury, under a proper charge. (*Post, pp.* 385, 386.)

Cases cited and approved: Seals v. State, 3 Bax., 459; Taylor v. State, 6 Lea, 234; Maher v. People, 10 Mich., 212.

---

## FROM DAVIDSON.

Appeal from the Criminal Court of Davidson County. —A. B. NEIL, Judge.

ED. J. SMITH, W. C. CHERRY, and W. E. STEGER, for Freddo.

ASSISTANT ATTORNEY-GENERAL FAW, for State.

MR. JUSTICE WILLIAMS delivered the opinion of the Court.

The plaintiff in error, Raymond Freddo, was indicted in the criminal court of Davidson county for the crime of murder in the first degree, alleged to have been committed on the body of James Higginbotham on December 22, 1911, and was found by the jury guilty of murder in the second degree; his punishment being fixed at ten years' imprisonment. After the verdict, a motion for a new trial was overruled, and appeal prayed to this court, where errors are assigned.

Two of the assigned errors go to lack of due support of the verdict by the evidence; and it is earnestly and ably urged in behalf of plaintiff in error that the facts adduced did not warrant a verdict of guilty of a crime of degree greater than voluntary manslaughter, if guilt of any crime be shown.

By the preponderance of the proof, we deem the record to establish the facts to be: That in the roundhouse department of the shops of the Nashville & Chattanooga Railway Company, at Nashville, from fifty to sixty men were employed, among them being plaintiff in error, Freddo, and the deceased, Higginbotham. Freddo was at the time about nineteen years of age; he had been from the age of four years an orphan; he had been reared thereafter in an orphanage, and yet later in the family of a Nashville lady, with result that he had been morally well trained. The proof shows him to have been a quiet, peaceable, high-minded young man of a somewhat retiring disposition. Due, perhaps, to the loss of

his mother in his infancy, and to his gratitude to his foster mother, he respected womanhood beyond the average young man, and had a decided antipathy to language of obscene trend or that reflected on womanhood.

Deceased, Higginbotham, was about six years older than Freddo, and was one of a coterie of the roundhouse employees, few in number in comparison with the whole, given to the use of obscene language, and to the frequent application to those of the coterie, and at times to others not of their set who would permit of it, of the expression "son of a bitch"—meant to be taken as an expression of good fellowship or of slight depreciation. Deceased, prior to the date of the difficulty, had applied this epithet to plaintiff in error, Freddo, without meaning offense, but was requested by the latter to discontinue it, as it was not appreciated, but resented. It was not discontinued, but repeated, and Freddo so chafed under it that he again warned deceased not to repeat it; and the fact of Freddo's sensitiveness being noted by the mechanic, J. J. Lynch, under whom Freddo served as helper, Lynch sought out deceased in Freddo's behalf and warned him to desist. On Lynch's telling deceased of the offense given to plaintiff in error, and that "he will hurt you some day," deceased replied, "the son of a bitch, he won't do nothing of the kind."

By a strong preponderance of the evidence, deceased is shown to have been habitually foul-mouthed, overbearing, and "nagging and tormenting" in language, and at times in conduct.

On the afternoon of the tragedy, Higginbotham and Freddo were engaged, as parts of a small force of men under Foreman Lynch, in the packing of a locomotive cylinder—putting a pin in the crosshead. Deceased, so engaged, was in a squatting posture, holding a pinch bar. It appears that some one, thought by deceased to have been Freddo, had spilled oil on deceased's tool box, and as he proceeded with his work the latter, in hearing of the crew, remarked: "Freddo, what in the hell did you want to spill that oil on that box for. If some one spilled oil on your box you would be raising hell, wouldn't you, you son of a bitch?" Freddo asked Higginbotham if he ment to call the former a son of a bitch, and was replied to in an angry and harsh tone: "Yes, you are a son of a bitch." The plaintiff in error, standing to the left of and about eight feet away from deceased, seeing deceased preparing to rise or rising from his squatting posture, seized a steel bar, one yard long and one inch thick, lying immediately at hand, and advancing struck deceased a blow on the side of his head, above the left ear, and extending slightly to the front and yet more to the rear of the head, but not shown to have been delivered from the rear. Deceased in rising had not gained an erect posture, but is described as stooping at the time the blow was delivered.

Plaintiff in error testified that deceased, in rising, was apparently coming at him; that deceased made a gesture, and had his hand behind him all the time; that he (Freddo) believed that Higginbotham was going to strike; and that he struck because of anger at the epi-

thet and to defend himself, but would not have struck but for deceased's movement. It appears, however, that deceased had not gained a position where he could strike the accused, and it does not appear that he had anything in his hand with which to attack; and the evidence preponderates against the prisoner on the point of deceased's having his hand behind him.

The character of plaintiff in error for truth and veracity was not attacked, but was affirmatively established.

Higginbotham fell on the pinch bar, from which his body suspended, until he was removed to a hospital, where shortly he died from the effects of the wound.

It is apparent to the court that the blow was struck by plaintiff in error in sudden anger and passion, aroused by the epithet repeated and emphasized in a tone that made it opprobrious, and the more so in view of the repeated warnings that had preceded. Theretofore plaintiff in error had entertained neither friendship nor hostility towards deceased; and the proof indicates that after the warnings and before the killing the two had been on amicable, but not familiar, terms.

Deceased was taller than plaintiff in error, and of weight 165 pounds, or about thirty pounds in excess of the latter's.

As has been indicated above, we deem the facts sufficient to show that plaintiff in error killed deceased under the impulse of sudden heat of passion; but, no matter how strong his passionate resentment was, it did not suffice to reduce the grade of the crime from mur-

der to voluntary manslaughter, unless that passion were due to a provocation such as the law deemed reasonable and adequate; that is, a provocation of such a character as would, in the mind of an average reasonable man, stir resentment likely to cause violence, obscuring the reason, and leading to action from passion rather than judgment.

While the testimony indicates that plaintiff in error was peculiarly sensitive in respect of the use by another, as applied to him, of the opprobrious epithet used by deceased, yet we believe the rule to be firmly fixed on authority to the effect that the law proceeds in testing the adequacy of the provocation upon the basis of a mind ordinarily constituted—of the fair average mind and disposition. *Seals* v. *State,* 3 Baxt., 459, 462; *Johnson* v. *State,* 11 Lea, 47; *Reg* v. *Welsh,* 11 Cox, C. C., 336; *State* v. *Ferguson,* 2 Hill (S. C.), 619, 27 Am. Dec., 412; *Ryan* v. *State,* 115 Wis., 488, 92 N. W., 271.

In the last-named case, Chief Justice Cassoday, speaking of a charge that embodied the above principle, said: "The precise objection to this portion of the charge is that it does not make the guilt of accused to turn upon his own heat of passion, but upon the heat of passion of ordinary men of fair average disposition. True, the accused alone was on trial; but deceased was a party to the controversy which led to the killing. A learned text-writer, speaking on the subject, says: 'The sufficiency of the provocation does not depend alone on whether it actually caused passion and heat of blood in the defendant, but also on whether it was calculated to

cause such a state of mind in a reasonable person' " citing 1 McClain, Crim. Law, secs. 337, 338; 21 Am. & Eng. Enc. L. (2d Ed.), 177, 178. See, also, 21 Cyc., 742.

The rule in this State is, as it was at common law, that the law regards no mere epithet or language, however violent or offensive, as sufficient provocation for taking life. *Williams* v. *State*, 3 Heisk., 376, 392; Wharton on Homicide (3d Ed.), sec. 173.

Courts have often had under consideration, in connection with the existence of adequate cause, the use of the vile epithet used by deceased just before he was killed, "son of a bitch," and quite without exception have held these words not to constitute adequate cause of provocation.

In Texas, where by statute the use of insulting words or conduct by the person killed towards a female relative of the slayer is made adequate cause to reduce the offense from murder to manslaughter, the courts of that State have felt impelled to hold the use of that particular opprobrious epithet, unfortunately so common in certain ranks of society, not to be adequate. *Levy* v. *State*, 28 Tex. App., 203, 12 S. W., 596, 19 Am. St. Rep., 826. and later cases in accord.

It is contended, however, that while the use of such an epithet may not of itself be sufficient cause for provocation, yet that, looked to in connection with the conduct of the deceased at the time of its utterance, in rising from a squatting to a stooping posture, just reached as the blow was delivered, the epithet and the

act in combination make a case of adequate provocation.

The common law rule appears to be that an assault, too slight in itself to be a sufficient provocation, may become such when accompanied by offensive language. *Reg.* v. *Sherwood*, 1 Car. & Kir., 554; *Reg.* v. *Smith*, 4 Fos. & F., 1066; *State* v. *Buffington*, 71 Kan., 804, 81 Pac., 465, 4 L. R. A. (N. S.), 158, 114 Am. St. Rep., 500, and cases cited in notes.

In *Wadlington* v. *State*, 19 Tex., App., 266, it was said: "Suppose we admit that the insulting words and charges of Contat (the deceased) were not alone sufficient; suppose we admit that his assault upon defendant was so slight as to show no intention to inflict pain or injury, and consequently that by and of itself it was also insufficient; but, on the other hand, suppose we find them, as in this case, not isolated from one another, but united together, does our statute declare that when they are thus united together they shall not together and as a whole constitute adequate cause? We know of no such declaration."

But can words, not accompanying an assault, imminent or actual, or a trespass, make adequate the provocation?

This court in *Seals* v. *State*, 3 Baxt., 459, pronounced on the effect of abusive language used in the defendant's own house (a trespass) in the presence of his family, and held that the jury's province was to determine under proper instructions whether the obscene language of deceased, in connection with his vexatious conduct,

Freddo v. State.

was calculated to produce passion that would obscure the reason of an ordinary man.

In *Grainger* v. *State*, 5 Yerg., 460, 26 Am. Dec., 278, the deceased was "advancing directly on Grainger without stopping, and, whilst advancing, was shot." Deceased shot only to protect his person from threatened violence, that was great. The court held that if defendant thought deceased intended to commit a battery upon him less violent than great bodily harm, to prevent which he killed deceased, it was manslaughter.

Thus, illustrating the rule: If, using abusive language, a deceased is advancing with a knife drawn, his slayer would be guilty of manslaughter only. *Gray* v. *State*, 47 Tex. Cr. R., 375, 83 S. W., 705; *Golden* v. *State*, 25 Ga., 527; Wharton, Hom., sec. 173. But if a knife be drawn, accompanied by use of abusive words, and there is no attempt to use the knife, the crime would not be reduced to manslaughter. *Edwards* v. *State*, 53 Ga., 428; *Ex parte Warrick*, 73 Ala., 57; *Phelps* v. *State*, 75 Ga., 571.

There is no assignment of error to the effect that the trial judge failed to give the jury proper definitions of and distinctions between murder in the second degree and manslaughter, nor is the charge subject to that criticism.

The stroke having been delivered by plaintiff in error at a moment when deceased may have been found by the jury not to have been in a position to assault him, and since the determination of the fact whether the

provocation relied upon in such a case is adequate or reasonable is, under a proper charge, for the jury (*Seals* v. *State*, supra; *Taylor* v. *State*, 6 Lea, 234; *Maher* v. *People*, 10 Mich., 212, 81 Am. Dec., 781; Wharton on Homicide [3d Ed.], sec. 173), we hold that the errors assigned and here treated of are not well taken. Other assignments of error are disposed of orally.

Affirmed.

In view of the very good character of the young plaintiff in error, as disclosed in the record, and of the peculiar motive and the circumstances under which he acted, we feel constrained to and do recommend to the governor of the State that his sentence be commuted to such punishment as the executive may, in the light of this record and opinion, in his discretion think proper. To allow time for such application, execution of sentence is ordered stayed for ten days from this date.