**Robert BAXTER, Plaintiff-in-Error,**

**v.**

**STATE of Tennessee, Defendant-in-Error.**

Court of Criminal Appeals of Tennessee.

May 11, 1973.

Certiorari Denied by Supreme Court
Nov. 19, 1973.

James P. Diamond and H. T. Etheridge, Jr., Jackson, for plaintiff-in-error.

David M. Pack, Atty. Gen., and Robert H. Roberts, Asst. Atty. Gen., Nashville, Whit LaFon, Asst. Dist. Atty. Gen., Jackson, for defendant-in-error.

## OPINION

OLIVER, Judge.

Convicted of first degree murder and sentenced to 99 years in the penitentiary, Baxter has duly perfected an appeal in the nature of a writ of error to this Court.

The defendant's only complaint with respect to the sufficiency of the evidence to warrant and sustain the verdict is reflected in his first Assignment of Error charging there was no evidence that his killing of the deceased was "willful, deliberate, malicious, and premeditated."

Since this Assignment necessitates consideration of the material evidence, we summarize it briefly. Shortly after 1:00 p.m. on Saturday, September 11, 1971, the defendant inquired at a garage in Jackson

whether the deceased, Norris Attaway, was working there. From there he drove the intervening half-mile to the city dump where the deceased was operating a bulldozer. After stopping his car in a position headed toward the highway, Baxter shot the deceased twice with a single barrel shotgun. The deceased started crawling on his hands and knees toward his co-worker asking him for help. When this co-worker ran to meet the deceased, he got up and ran to his co-worker and embraced him and got behind him so that the co-worker was between him and the defendant. The defendant then ordered this co-worker to get the deceased from behind him and said he was going to shoot. Notwithstanding the deceased and his co-worker both were begging the defendant not to shoot him again, when the deceased broke away from his co-worker and started running and fell, the defendant got out of his car and re-loaded the shotgun and shot the deceased again. And although both the deceased and the co-worker continued to plead with the defendant not to shoot him, he deliberately re-loaded his shotgun and shot the deceased again. As he returned to his car, Baxter told the deceased that he would come back and give him some more if he heard of him speaking to his wife, and threatened to give the co-worker "some of it" if he heard of him telling what had occurred. He then got in his car and drove away. The deceased expired at the hospital that night.

After shooting the deceased, the defendant went to the cafe where his wife was employed and told her he had shot the deceased four times at the city dump. He then went outside and got his shotgun and came back in and asked her if she wanted to die there, and then shot a hole through the wall. He then ordered all the customers out of the cafe and made her get in the car with him and then fired the gun into the air and told her he was going to take her out into the woods and kill her. She escaped when he stopped at a stop sign. He gave no appearance of being intoxicated, although he had been drinking. He

surrendered at the Jackson Police Station on October 3, 1971 after, as he stated, he had flown to Canada, to New York, and back to Jackson.

According to this record, the defendant had left his wife nine times and she had left him once within their marriage of a little more than two years. He left her in June of 1971 because he did not want to pay the doctor bill for delivery of their baby, and did not return until two weeks after the baby was born on July 28, and during that time he did not call her or furnish her any support while she was living with her parents. They were still separated at the time of this killing. He had asked her one or two times to come back to him and she agreed to do so on the Wednesday before the shooting if he would get a house, but thereafter he drew a knife on her. He had accused her several times of running around with the deceased and other men, "That's all he ever talked about was somebody." On the Wednesday before this homicide he accused her of keeping company with the deceased. She testified that on four or five occasions the deceased took her home when she got off from work at midnight while she was living with her parents, since this was on his way home, and that she had never run around with him or kept company with him or had any affair with him; that the last time he took her home was a week or two before he was killed; that one time before the baby was born the defendant came to the cafe and she refused to ride home with him because he said he was going to whip her, and he then asked the deceased to take her home; that she had known the deceased four or five years and one time he helped her get her car started on a grocery store parking lot; that the defendant asked her numerous times to quit her waitress job and she told him she was not going to do so because she had to work to support herself and the baby. Wednesday before the killing he tried to get the manager to fire her and opened a knife and started around the end of the bar threatening to cut the manager's head

off, but stopped when the manager confronted him with a pistol.

The defendant did not testify. He presented his brothers James and Les, his brothers-in-law Phillip M. Morphias and Thomas L. Robertson and his cousin Mrs. Elaine Rose and Mrs. Reba Williams, whose collective testimony was that he was intoxicated from the early morning hours until about noon the Saturday the homicide occurred. Les Baxter testified that about a week later, in response to a telephone call from the defendant he went to Lyons, New York and brought the defendant home and he surrendered.

So, this is not a case where the defendant suddenly found out about his wife's infidelity and proceeded immediately or within a short time to kill her paramour in the heat of passion. Instead, it is all too plain from this record that this defendant cared nothing for his wife of two years, had left her nine times during their marriage and practically deserted and abandoned her, continually tantalizing her, nevertheless, with accusations of promiscuity with the deceased and other men. There is no proof in this record that the defendant's wife was ever unfaithful or that he had any knowledge whatever to the contrary or any reasonable ground to believe otherwise.

■ This record simply does not support the defendant's theory and insistence that his killing of the deceased was not a willful, deliberate, malicious, and premeditated act, and that, instead, it was done under the heat of passion produced by adequate provocation which disturbed his reason and caused him to act without due deliberation or reflection and upon impulse rather than judgment. Even if he had at times worked himself into a passion because of suspicion, wholly unfounded under this record, he had ample time for his passion to subside.

■■ Armed with a single barrel shotgun, this defendant simply started out to hunt the deceased and found him at his place of employment and methodically proceeded to shoot him four times, re-loading the gun each time, the last two shots being fired while the deceased lay wounded and helpless upon the ground begging for his life. The element of premeditation and deliberation may be inferred from the circumstances of the killing. Tooley v. State, 1 Tenn.Cr.App. 652, 448 S.W.2d 683. Deliberation and premeditation may be inferred from the manner in which the killing was committed, and repeated shootings, blows, and other acts of violence are sufficient evidence of premeditation. Green v. State, 1 Tenn.Cr.App. 719, 450 S.W.2d 27 (concurring opinion). In this case, as in *Green*, the defendant deliberately shot the deceased repeatedly after he fell from the first shot.

■ Furthermore, the law is well settled that if premeditation exists, it is immaterial that the defendant was in a passion when that design was executed. Presley v. State, 161 Tenn. 310, 30 S.W.2d 231.

■ There is no merit in the defendant's Assignment complaining that the trial judge erroneously overruled his motion for a continuance. That motion, made orally by defense counsel after the trial jury had been empaneled and sworn, was predicated upon the averment by counsel that two absent subpoenaed witnesses would testify that the deceased "was going with the defendant's wife." Patently, having elected to rest his case upon the testimony of others concerning his unsoberness during the 12 hours or more preceding the killing, and having eschewed giving the jury the benefit of his own knowledge about his condition during that period of time, and about his wife's alleged infidelity upon which he now bases his claim that his slaying of the deceased was not premeditated murder but the result of passion engendered and provoked by her unfaithfulness, he is in no position now to complain that he was denied a continuance. For, under those circumstances, obviously there is no merit to his argument that those witnesses "would

corroborate the defendant in his contention that he was in a state of mind at the time of killing that he did not know what he was doing and that he was laboring under adequately aroused passion so great at the time of the killing to obscure his reasoning." He voiced no such contention in his trial. Nor did any of his witnesses say he was so drunk at any time before the killing that he did not know what he was doing, and he expressed no such contention.

Furthermore, there is no proof in the record that the two absent witnesses, because of which he sought a continuance, told the defendant on the day before the killing, or any other time, that his wife had been keeping company with the deceased.

██ Beyond that, as stated, the continuance motion was oral, and it was not supported by an affidavit. Continuances for the purpose of obtaining evidence not then available or in reach must be supported by a filed affidavit specifying the testimony relied on. T.C.A. § 19–413; Mitchell v. State, 92 Tenn. 668, 23 S.W. 68.

██ It is elementary that a motion for a continuance is addressed to the sole discretion of the trial judge, and that his judgment will not be disturbed in the absence of a clear showing of gross abuse of his discretion to the prejudice of the defendant. Moorehead v. State, 219 Tenn. 271, 409 S.W.2d 357; State ex rel. Carroll v. Henderson, 1 Tenn.Cr.App. 427, 443 S.W. 2d 689.

██ The burden rests upon a party assigning errors in connection with matters of continuance to show that the action of the court was prejudicial. Appellate courts will look to the result of the trial before them. The only test that may be applied is whether one has been deprived of his rights and whether an injustice has been done. The reviewing court will consider the entire record for the purpose of determining whether or not the judgment rendered was proper. A reversal will be ordered on account of denial of a continu-ance only if the appellate court is convinced that the complaining party did not have a fair trial and that a different result would or might reasonably have been reached had there been a different disposition of the application for a continuance. Tennessee Procedure in Law Cases, Higgins & Crownover, § 885. Upon this record we cannot say that the trial court abused its discretion to the prejudice of the defendant in denying his motion for a continuance.

██ Likewise without substance is the defendant's final Assignment that the trial judge erroneously refused to permit a psychologist to testify as an expert as to his mental condition, since he did not interpose the defense of insanity. The proffered psychologist was a member of the staff of Central State Psychiatric Hospital to which the defendant was sent before trial for mental evaluation. She testified apart from the jury that she participated in the examination of the defendant and agreed with the hospital staff's conclusion and report that he was not insane and knew right from wrong and was competent to advise with counsel in his own defense. In the presence of the jury she identified the staff report and stated she was a member of the unit which rendered it and that it represented her opinion also. The trial judge committed no error in declining to allow the psychologist to go further.

Affirmed.

DWYER, J., concurs.

GALBREATH, Judge (dissenting).

In this appeal from a first degree murder conviction in the Madison County Criminal Court it is conceded that the motive for the brutal shotgun slaying of the victim was jealousy engendered by a belief on the part of the defendant that the victim had been having an affair with his estranged wife. There is no other explanation offered by either side for the homicide except that the defendant, rightly or

wrongly, had become convinced that his wife had become overly friendly with the deceased, Norris Attaway, who would on occasion take her home from a beer tavern where she worked for the owner. The wife, as a witness for the State, maintained that the relationship was innocent and that the reason for her having to accept rides home from the victim was because the defendant would not take her himself or provide means for her to transport herself. Be that as it may, the defendant accused his wife on several occasions of having the affair; and a few days before the fatal shooting on Saturday, the 11th day of September, 1971, he asked he her to quit going with Attaway and to stop working in the tavern. She refused to stop working and told the defendant that she had to provide for herself and the baby born after he had left her the past June.

There is some dispute as to whether the last confrontation between the defendant and Mrs. Baxter was on Wednesday or Friday before the killing, but in any event the defendant armed himself with a shotgun and a pistol and on Saturday sought out the deceased at his place of work. In spite of pleas from his helpless victim and a co-worker to not shoot him, he did so three times, each time methodically reaching into a pocket for a shell with which to reload the single barrel shotgun. He then threatened to return and shoot Attaway again if he ever heard of him speaking to his wife again. He also threatened the witness with like consequences if he said anything about what had happened. He then went to the tavern where his wife was and told her what he had done. He forced her at the point of the shotgun, after shooting a hole in the wall, to accompany him in his car telling her he was going to take her out in the woods and kill her. In a remarkable deference to law and order he stopped the car in obedience to a stop sign and Mrs. Baxter jumped out and escaped as he drove away. He later voluntarily surrendered to the Jackson Police Department.

It is primarily contended on behalf of the plaintiff that the facts discussed above do not support a finding of a willful, deliberate, malicious, and premeditated murder as defined by law so as to support the verdict and sentence of ninety-nine years in the penitentiary.

The elements of murder and manslaughter have repeatedly been discussed by our Supreme Court. One of the best treatises on the subject may be found in Rader v. State, 73 Tenn. 610:

"When the murder is not committed in the perpetration of, or attempt to perpetrate, any of the felonies named . . then, in order to constitute murder in the first degree, it must be perpetrated by poison or lying in wait, or some other kind of willful, deliberate, malicious and premeditated killing; that is to say, the deliberation and premeditation must be akin to the deliberation and premeditation manifested where the murder is by poison or lying in wait—the cool purpose must be formed and the deliberate intention conceived in the mind, in the absence of passion, to take the life of the person slain. Murder by poison and lying in wait, are given as instances of this sort of deliberate and premeditated killing, and in such cases no other evidence of the deliberation and premeditation is required; but where the murder is by other means, proof of deliberation and premeditation is required. It is true it has been held several times that the purpose need not be deliberated upon any particular length of time—it is enough if it precede the act; but in all such cases the purpose must be cooly formed, and not in passion, or, if formed in passion, it must be executed after the passion has had time to subside. As was clearly pointed out by the circuit judge, if there was provocation of a sufficient character, and the killing was under passion thus excited, it would be manslaughter. But it is not every provocation that will reduce the killing to manslaughter, not even blows under all circumstances, for

the resentment must bear a reasonable proportion to the provocation. Nevertheless, although there be no sufficient provocation to reduce the killing to manslaughter, still there may be such provocation as to excite passion in fact, and if the purpose to kill is formed in passion thus excited, and executed without time for the passion to cool, it is not murder in the first degree, but murder in the second degree."

The nature of the passion under provocation spoken of is described in another case.

"It is not necessary to reduce the killing to manslaughter that the passion should be so great as to render the defendant incapable of deliberation or premeditation. If the circumstances be such as are calculated to produce such excitement and passion as would obscure the reason of an ordinary man and induce him, under such excitement and passion, to strike the blow that causes the death of the deceased, this will reduce the killing to manslaughter." Toler v. State, 152 Tenn. 1, 260 S.W. 134.

An adequate provocation is said to be:

"a provocation of such a character as would, in the mind of an average reasonable man, stir resentment likely to cause violence, obscuring the reason, and leading to action from passion rather than judgment." Freddo v. State, 127 Tenn. 376, 155 S.W. 170.

The illicit relationship of a spouse and another is adequate provocation to reduce the homicide to voluntary manslaughter.

"We are of the opinion that if, as a matter of fact, the deceased had debauched the wife of plaintiff in error, and the plaintiff in error had been apprised of that fact and had become convinced of its truth on the day of the wedding or thereafter, and, with reasonable expedition, while under the influence of passion and agitation produced by such information, had killed Noe, he would only

have been guilty of voluntary manslaughter." Davis v. State, 161 Tenn. 23, 28 S.W.2d 993.

A rather diligent search of the compiled decisions of our Supreme Court has failed to uncover a single opinion in which a slaying prompted by the jealous passion aroused by a firm conviction on the part of a husband that another man has debauched his wife has been held to be murder in the first degree. The suppressed frustration and resentment that naturally arises in the mind of a husband whose wife has been sexually active with another man is too well known to warrant elaborate discourse. That this powerful emotion may not subside even after days of worry and mental turmoil is also recognized. Thus it sometimes occurs that after days and nights of brooding, reflection and unsuccessful efforts to overcome the violence that is locked up inside, the reason is overcome and tragedy results.

The fact that the defendant appeared calm to witnesses who saw him before the shooting does not dispel the fact that in all likelihood he was, and had been for days, working himself up to the ultimate frenzy of jealously that motivated his final outburst. This very appearance of calm and the effort to hide the real emotion has long been recognized as much worse than would be outbursts of vocal rage accompanied by crying and threats against the object of passion, others or himself. Shakespeare was right, as students of the emotion know, when he advised, "Give sorrow words. The grief that does not speak whispers the o'er burdened heart and bids it break." Our Supreme Court recognized this in a case in which it reduced to voluntary manslaughter the slaying of a suspected paramour months after the husband learned of the supposed illicit relationship between his wife and his victim:

"Nor is this conclusion rebutted by the fact that defendant engaged in casual and calm conversation with Mrs. Porter on his way to Fayetteville after being

given this additional information by Mills. In a case somewhat like this one this Court took notice of the fact that 'suppressed anger is a common accompaniment of passion, the deepest and most powerful emotion * * *'. Drye v. State, 181 Tenn. 637, 646, 184 S.W.2d 10, 13. Add to that the fact that unexpectedly he met the debaucher of his wife and the destroyer of his home within an hour after he had received information correctly convincing him of that fact." Whitsett v. State, 201 Tenn. 317, 299 S.W.2d 2.

Error is assigned to the refusal of the trial judge to grant a continuance in order that the defense could produce two witnesses who, it claims, would have testified that they told the defendant of improper relations between Mrs. Baxter and the deceased. This information may well have been the deciding factor that tipped the already unbalanced scales of reasoning in the defendant's mind. However, the trial judge remarked that there was enough proof already in the record to substantiate the belief of the defendant that his wife was having an affair with Attaway, and he declined to grant the continuance for the purpose of such cumulative testimony. In this exercise of his sound discretion he was not in error, but his very acknowledgement that the defendant was possessed of such provocative information, whether true or false, demonstrates that the defendant at the time of the killing was acting in the hot blood of passion.

The time may soon come when all persons convicted of first degree murder will indiscriminately be put to death as the only permissible punishment if the death penalty is to conform to constitutional standards discussed in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346. If this ever happens, it is my firm conviction that no jury would ever decree death as the deserved punishment of a man who, convinced of his wife's infidelity with another man, in a torment of passion kills either the object of his love or the person he is convinced has defiled her body. As aforesaid, not one decision of our Supreme Court has been found after diligent research which affirms a first degree murder conviction where the slaying was motivated by jealousy of a husband over his wife's suspected infidelity, although there is ample precedent for my isolated position here that such crimes are not first degree murder. See Davis v. State, *supra*.

It is conceded in defendant's brief that he is guilty of second degree murder or manslaughter. All murders are presumed in law to be in the second degree, particularly those in which a deadly weapon is employed. See Witt v. State, 46 Tenn. 5. The burden, once the fact of killing has been proved, is on the State to raise the degree and on the defendant to prove facts in mitigation so as to reduce it to manslaughter. See Nance v. State, 210 Tenn. 328, 358 S.W.2d 327. While the facts proved in this case in my opinion would not support first degree murder, I cannot say that the jury would not have been justified in finding the defendant guilty of murder in the second degree, and I would reduce the degree of the offense and the punishment accordingly under such authorities as Forsha v. State, 183 Tenn. 604, 194 S.W.2d 463.