IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 13, 2000

## STATE OF TENNESSEE v. EDWARD MITCHELL

**Direct Appeal from the Criminal Court for Shelby County
Nos. 98-10145 and 98-10146     Carolyn Wade Blackett, Judge**

_____

**No. W1999-01314-CCA-R3-CD  - Filed March 1, 2001**

_____

The defendant, Edward Mitchell, appeals as of right from his conviction by a jury in the Shelby County Criminal Court for two counts of aggravated assault, a Class C felony.  His sole issue on appeal is whether the trial court erred by denying him a continuance because of the unavailability of a witness.  After a review of the record, we reverse the judgment of the trial court and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right;
Judgment of the Criminal Court Reversed and Remanded.**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and DAVID G. HAYES, J., joined.

A.C. Wharton, Jr., District Public Defender; Garland Ergüden, Assistant Public Defender; and Robert Felkner, Assistant Public Defender, for the appellant, Edward Mitchell.

Paul G. Summers, Attorney General and Reporter; Mark E. Davidson, Assistant Attorney General; William L. Gibbons, District Attorney General; and Betsy Carnesale, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Defendant's conviction resulted from a shooting incident that occurred during an altercation between Defendant and two men, Paul King and Chris White, on the evening of May 19, 1999. Defendant was working as a security guard for the Greenbriar Apartment Complex ("Greenbriar"). King testified that he met Defendant at Greenbriar late in the evening on May 19, 1999 while he and White were cruising the apartment's parking areas.  At that time, King worked as an auto repossessor and White frequently assisted him.  Shortly after they began to scan the parking lots, King noticed that Defendant was following him.  Defendant approached King, asking to see his "repo papers." Defendant told King that he was "with the security company" for Greenbriar.  King observed that Defendant did not have a security uniform, or a hat, or badge on his person. Moreover, Defendant's car was unmarked and there was a woman sitting inside of it.  King responded to Defendant's

request by asking for some identification to prove that Defendant was indeed employed as a security officer. Defendant refused. King testified that, for these reasons, he did not believe that Defendant actually worked for the apartment security office. He refused Defendant's request for papers and drove away.

King testified that Defendant continued to follow he and White until they left the property belonging to the apartment complex and entered the public street adjacent to it. There Defendant turned a bright light on the truck, demanding that they leave the premises. At first, King told Defendant that the street was out of his jurisdiction and to leave him alone. Then he decided to record Defendant's license number so that he could later find out whether Defendant did, in fact, work for the security company. At this time King also decided to show Defendant his repossession papers so that he could complete his work. When King backed up his truck to do these things, however, Defendant had disappeared. A short time later, King found Defendant in his car. Defendant was parked facing out of a driveway, and his female companion was gone. King then parked his truck at an angle in front of Defendant's car. But, when he emerged from his truck to hand Defendant his papers, Defendant did not want to see them any longer. Instead, Defendant insisted that King get back into his truck. Before King could comply, Defendant started shooting at him.

King testified that the bullets fired by Defendant hit the front of his truck and the side of his door but that neither he nor White were struck. White, who had stayed in the truck during the entire episode, ducked down onto the floorboard as they drove away. King testified that Defendant was approximately ten feet from King and White when the firing began and that Defendant continued to shoot at them as they drove off. King said that he and White had carried no weapons and that there were no tools or equipment on his truck. King claimed that they did not threaten Defendant or speak to him abusively at any time during their encounter.

King testified that after he left the apartments he called the police from a nearby Krystal restaurant. The police arrived approximately fifteen minutes later, searched the truck, then escorted King and White back to the scene of the shooting. When they returned to the apartments, King noticed that Defendant was wearing different clothes.

Chris White testified that he frequently assisted King with his repossession jobs and that they were working together on the evening of May 19, 1999. Approximately five minutes after King and White arrived at Greenbriar, Defendant approached them wanting to see their "papers." White testified that Defendant did not look like a security officer when they met him. Defendant was dressed in a striped shirt and blue jeans. He did not wear a badge and his car was unmarked with a woman sitting in the passenger seat. When Defendant refused to show them identification to confirm that he was indeed working as security for the property, White and King decided that Defendant was not telling them the truth and they drove away. They saw Defendant again a short while later.

Meanwhile, King had decided to give Defendant the papers he requested. They located Defendant parked in a driveway, and they parked in front of his car. When King emerged from his truck, Defendant pulled out a gun and told him to get back inside. White testified that they started to leave, but Defendant started shooting at them before King could close the truck's door. Defendant was standing five to six feet from White and King when he fired eight to twelve shots in their direction. Defendant continued to shoot as they drove away. White testified that he did not get out of the truck during the episode and he did not have anything that could have been construed or used as a weapon. White testified that neither he nor King threatened Defendant at any time during the incident and that King's truck did not hit or block Defendant's car when they parked in front of it.

Gary Deel, an officer with the Memphis Police Department, testified that he was on duty the evening of May 19, 1999 when the police received a complaint from Defendant. When Deel arrived at Greenbriar, Defendant was waiting by his vehicle. Defendant explained to him that he fired three rounds from his duty weapon at two males in a wrecker-type vehicle during a confrontation. Defendant showed Deel his security officer identification and the gun he used, which at that time was sitting in plain view on the front seat of his vehicle. Defendant pointed also to three shell casings laying on the ground. Defendant told Deel that he was dressed in his security uniform during his encounter with King and White but that he changed his clothing after calling the police.

Officer Deel testified that King and White arrived ten to fifteen minutes later and gave the police statements which contradicted the information that they received from Defendant. Moreover, the side of King's truck showed eight bullet holes. A search of the immediate area revealed no crowbars or tools which may have been used by King and White as a weapon. After receiving statements from King, White, and Defendant, the supervisor at the scene decided to arrest Defendant. A search incident to arrest revealed seven additional shell casings in Defendant's pocket, all matching the type used in Defendant's gun. Although Defendant did not offer this evidence to the police, he was otherwise cooperative, calm and polite throughout their questioning.

Robert Akines, also with the Memphis Police Department, testified that he responded to a separate complaint from King and White on May 19, 1999. He met the complainants at the Krystal restaurant, then escorted them back to the scene. Upon their arrival, Akines spoke briefly with Defendant who claimed that he fired three rounds at King and White because they came at him with crowbars. Defendant said he warned King and White that he would shoot if they did not stop. Akines testified that he searched King's truck, inside and out, but discovered no crowbars or anything which could be construed as a weapon. Defendant was wearing a black tee-shirt and dark pants when Akines spoke with him. Defendant's security shirt was located in the trunk of his car.

Defendant testified that he was employed by the Imperial Guard Service as a security officer for Greenbriar and that he was on duty the night of May 19, 1999. Prior to his confrontation with King and White, Defendant drove to a nearby convenience store to purchase headache medicine. Catris Tolbert, a female neighbor, accompanied him. He had offered Tolbert a ride since she was also going to the store and the hour was late. Upon their return, Defendant noticed a wrecker-truck, of the type often used to repossess cars, cruising Greenbriar's parking area. Defendant testified that

he placed his security light on the dashboard, then approached the occupants of the truck, King and White. Tolbert remained in Defendant's car.

Defendant testified that immediately after he introduced himself as the security officer for the property, King and White started "talking crazy" and cursing him. Their behavior so frightened Tolbert that she asked to go home. Defendant left King and White to give Tolbert a ride to her apartment building. Afterward, Defendant called the dispatch office to inform them that he was involved in a situation where a "repo" driver would not cooperate with him. A short time later, Defendant again observed King and White on Greenbriar property. They initially appeared as though they would drive by him then suddenly made a left instead, hitting the bumper of Defendant's car as they turned. Afterward they stopped, and both King and White jumped out of the truck. The passenger, White, had an object in his hand which resembled a crowbar and the driver, King, had his hand cupped under his shirt which made Defendant believe that he had a gun. Defendant testified that they "ambushed him and almost got him," but the door of Defendant's car blocked their approach. Defendant grabbed his pistol then shouted at the two men, "freeze, stop, stop–don't get killed" as he ran toward the rear of his car. Defendant testified that he fired three shots at King, the driver, and the remaining shots at White, the one with the crowbar, in self-defense because they refused to stop. After King and White drove away, Defendant called the police.

Defendant testified that he picked a number of shell casings off the ground and placed them in his pocket for safekeeping while he waited for the police. Later, when police officers questioned Defendant regarding the number of shots he fired, he replied that he fired three rounds. Defendant testified that the officer cut him off at that point, instructing him to keep quiet. This prevented Defendant from explaining that he had fired additional shots at the second attacker. He did not tell the police about the shells in his pocket for the same reason, because the police instructed him not to talk. Defendant testified that he wore his security uniform shirt and badge during the incident with King and White but, because the uniform was "suffocating " him, he changed into other clothing after the shooting incident.

Catris Tolbert, a resident of Greenbriar Apartments, testified that she was the woman in the car with Defendant at the beginning of the incident on May 19, 1999. Earlier that evening, Defendant had given Tolbert a ride to the store. Tolbert testified that when they returned, Defendant spotted a wrecker-truck of the type frequently used to repossess cars. When Defendant approached the occupants of the truck, they began to curse at him angrily, using racial slurs and other abusive language. After five or six minutes of this, Tolbert said that she was frightened and wanted out of the car because she "knew that something was going to go down the way things was going." Tolbert lived only a few buildings away and walked home.

Shortly after Tolbert arrived at home, she went to bed. Tolbert testified that she did not call the police and that she did not hear gun shots later in the night. At trial, Tolbert did not recall Defendant asking King and White for their repossession paperwork, even though she told the police in an earlier statement that she heard Defendant make this request. Tolbert testified that she remembered Defendant wore a shirt that was imprinted with the word "security" that night. She also

recalled that Defendant's car had a police-type light on the dashboard even though the light was not present in the picture of Defendant's vehicle that was shown to her in court. At trial, Tolbert did not recall the majority of the information she had given in a statement to the investigating officer shortly after the incident.

The issue on appeal relates to Defendant's attempt to have Ms. Willie Hooks testify as a witness during his trial. Hooks was properly subpoenaed by Defendant in March, several months before the trial date. As late as September 8, the first day of trial, Hooks had assured defense counsel via telephone that she would be in court to testify on Friday, September 10. On the evening of September 9, Defendant drove to see Hooks and offer her a ride to court the next morning. It was then that Hooks told Defendant that she would not be in court the next day because she was under a doctor's orders to stay at home.

When court convened the following morning, defense counsel informed the trial court judge that Hooks was not present. He also advised the judge that Hooks' phone had been recently disconnected and that he did not know the name of her physician. Defense counsel requested that the judge grant a continuance or issue a warrant so that Hooks could be picked up and brought to the courthouse. Defense counsel declared Hooks to be a material witness, informing the court that she had provided an exculpatory statement and that her testimony was crucial to Defendant's claim of self-defense.

After a review of Hooks' exculpatory statement, the judge denied Defendant's requests for both the continuance and the warrant. The judge explained that although the missing testimony would probably be helpful to Defendant's case, the witness appeared unavailable to testify. The judge refused to put the court "in the position of dragging somebody out of their apartment when a doctor has confined them..." until she had more information regarding the witness' state of health. Because Defendant was planning to testify and one other eyewitness had already done so, the judge did not want "to hold up the trial for one person," even though defense counsel pointed out that the person referred to as an "eyewitness" by the judge was, in fact, not present at the time of the shooting.

Later that afternoon, defense counsel renewed his request for a continuance and made an offer of proof. The following portion of a statement taken from the absent witness, Ms. Hooks, in relevant part, was then read and placed in the record:

> MS. HOOKS: [S]o these two white fellows, they had something in their hand, and what it was, I don't know. It was a stick, a long stick or something. So what he had to do is – which I don't blame him – is get – get back and get out of the way. So he had to get back to his car, and he was trying to protect hisself. So he had his gun, and then he started shooting, and they got back in their truck so ... they left ... but these two white fellas, they tried to hit him first to get him.

INVESTIGATOR DORTCH: Okay, you said that they had something in their hand. Did they both get out of the truck at the same time and start approaching the security officer?

MS. HOOKS: Yes, they both got out at the same time.

INVESTIGATOR DORTCH: Okay. Did the security officer have his uniform on?

MS. HOOKS: Yes, he did.

INVESTOGATOR DORTCH: Okay, fully uniformed and they could see that he was a security guard?

MS. HOOKS: Yes.

Afterward, the court again denied Defendant's request for a continuance, and the trial concluded that same day without Hooks being used as a witness.

## ANALYSIS

Defendant contends that he was entitled to a continuance in order to procure Hooks' appearance as a witness. He asserts that Hooks' testimony was critical to his defense and that the trial court's denial of a continuance and/or attachment order to produce a properly subpoenaed witness was an abuse of discretion which violated his right to a fair trial. In response, the State contends that Defendant's failure to file a written motion with a supporting affidavit justified the trial court's ruling. The State also argues that the representations made by counsel left the trial court with little choice but to proceed because defense counsel offered no information that would indicate when, if ever, the witness would become available to testify. The State contends that these facts, considered together with the alleged repetitive nature of the missing testimony, make a denial of Defendant's motion for a continuance the trial court's only reasonable course of action. Defendant replies that where the appellate court is convinced that the complaining party did not have a fair trial and that a different result would or might reasonably have been reached had there been a different disposition of the application for a continuance, a reversal is proper. He contends that the circumstances in the instant case warrant just such a result. We agree with Defendant.

The decision to grant a continuance is within the discretion of the trial court. Moorehead v. State, 409 S.W.2d 357, 358 (Tenn. 1966). A reversal of a conviction may occur, though, if the denial of the defendant's request was an abuse of that discretion and the defendant was prejudiced as a direct result of the trial court's ruling. See State v. Dykes, 803 S.W.2d 250, 257 (Tenn. Crim. App.1990) (overruled on other grounds); Baxter v. State, 503 S.W.2d 226, 230 (Tenn. Crim. App.1973). Prejudice in this context occurs when a different result might reasonably have been reached if the continuance had been granted.

In considering whether or not denial of a continuance was appropriate, we have recognized that "the defendant has a fundamental constitutional right to compulsory process for the obtaining of witnesses and when the witness is shown to be material, the trial court has no discretion as to the issuance of such process." State v. Alvin Glenn Hughes, No. 02C01-9208-CR-0018-00183, 1993 WL 193712 at *5, Shelby County (Tenn. Crim. App., Jackson, June 9, 1993) (citing Bacon v. State, 385 S.W.2d 107 (Tenn. 1964); Tenn. Const. art. I, § 9; U.S. Const. amend. VI). We have also noted with approval a decision from Rhode Island which observed that, in the legitimate exercise of this right to obtain witnesses, "a reasonable opportunity must be afforded to make the process effective and, if necessary for this purpose, a reasonable adjournment of the trial should be granted." Id. (quoting State v. Rossi, 43 A.2d 323, 326 (R.I. 1945)). "'[I]nsistence upon expeditiousness in the face of a justifiable request for delay' can render a trial an empty formality so as to violate due process." Id. (quoting Ungar v. Sarafite, 376 U.S. 575, 588, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964)).

In most cases, a defendant seeking a continuance is obligated to file a written motion setting forth the grounds with particularity and a supporting affidavit showing the substance of the expected testimony, its relevance and materiality to the defense, including the need for it, the availability of the witness in the future, and the diligence used to obtain the witness' presence. Id. at *3; see Dykes, 803 S.W.2d at 257; State v. Bennett, 798 S.W.2d 783, 787-788 (Tenn. Crim. App.1990); State v. Frahm, 737 S.W.2d 799, 802 (Tenn. Crim. App.1987); State v. Howell, 672 S.W.2d 442, 445-446 (Tenn. Crim. App.1984). The State relies upon these requirements in its argument that Defendant's failure to file a written motion with a supporting affidavit justifies the trial court's ruling.

First, we observe that the Defendant received Hooks' statement from the prosecution in accordance with the state's legal obligation to turn over to defendants all exculpatory material relevant to guilt or punishment. See Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 215 (1963). Consequently, the exculpatory nature of the evidence is beyond question and, naturally, material to the defense. Secondly, the lack of a proper affidavit is not dispositive of the issue under circumstances such as those before us now. When the unavailability of a subpoenaed witness is not known until the last day of trial and defense counsel, as an officer of the court, states on the record the substance of the witness' expected testimony which shows such testimony to be highly material, and the record does not show a hint of defense complicity in the witness' unavailability, it would be "honoring procedural form in unreasonable fashion over substance to require a written motion or affidavit." Hughes, 1993 WL 193712 at *5.

Next, we find support for Defendant's position in a previously cited decision of this Court, State v. Alvin Glenn Hughes, No. 02C01-9208-CR-0018-00183, 1993 WL 193712, Shelby County (Tenn. Crim. App., Jackson, June 9, 1993). The defendant, Hughes, was convicted for aggravated assault by shooting a man in the leg. At the trial, the victim of the shooting identified Hughes as his assailant. Hughes had subpoenaed Carl Sawyer, a man who was an eyewitness to the shooting, to testify that Hughes was not guilty of the crime. Sawyer initially showed up to testify but disappeared midtrial. The trial court ordered an attachment for Sawyer, but went forward without him when he could not be located. Defense counsel requested a continuance because the errant witness was

critical in that he would testify that he actually saw the victim fight with and get shot by a man who was not the defendant. Notwithstanding this information, the trial court denied Hughes' requests for a continuance and the trial eventually concluded without Sawyer's testimony.

In the hearing upon a motion for new trial, Sawyer testified that he witnessed the shooting. Sawyer also testified that he knew Hughes and that Hughes did not shoot the victim. Sawyer explained that he was not present to testify at the trial because he had a dental appointment. Afterward, he could not be located because he was out of town. The trial court denied Hughes' motion for new trial and found Sawyer in contempt of court. On appeal to this Court, Hughes argued that this denial violated his rights to compulsory process and due process. The State responded that Hughes' failure to file a written motion with a supporting affidavit justified the denial of a continuance. Hughes replied that a written motion was unnecessary under the circumstances of that case.

Our Court agreed with the defendant in Hughes. We concluded that the trial court's denial of a continuance was an abuse of discretion and prejudicial to the defendant where the testimony of the missing witness was shown to be material to the defense and where, if a jury believed the testimony, there existed a reasonable probability that the result would have been different. Id. at *5. The Court in Hughes did not agree that the lack of a written motion or a written affidavit was controlling and considered the following facts significant: the state did not object to the motion being oral until the hearing for new trial, the prosecutor knew the witness was present at the beginning of trial and what his testimony would be, the trial court did not deny the motion based on the lack of affidavit, and there was not even a hint of defense complicity or neglect regarding the witness' disappearance. Id. at *3. We further noted that in Moorehead v. State, 409 S.W.2d 357 (Tenn. 1966), our supreme court came to a similar conclusion, stating that a proper affidavit is not an absolute requirement in a request for a continuance. The court in Moorehead reversed the conviction in the interest of justice because the denial of a continuance prevented the defendant's use of a material witness, even though the defendant's affidavit was insufficient on its fact to justify one. Id.

Finally, in Hughes we pointed out that the cases which require mandatory filing of an affidavit in support of a motion for a continuance rely primarily on Tenn. Code Ann. § 19-1-110(a) or on case law decided before the adoption of the Tennessee Rules of Criminal Procedure. Id. at *4 (citations omitted). Section 19-1-110 relates only to the civil procedure required in general sessions court, however. Tenn. Code Ann. § 40-18-103 governs continuances in a criminal case and subsection (b) specifically makes the filing of an affidavit mandatory only where the charge involves Class X felonies, which no longer exist. See Code Commission Notes § 40-18-103 (1997). Instead, the applicable law now states that the trial court may order a continuance upon "good cause shown" and does not specify the method which shall be used. See Tenn. Code Ann. § 40-18-103(c) (1997).

As held in Hughes, the requirement factor for an affidavit for a continuance is within the discretion of the trial court. See Hughes, 1993 WL 193712 at *4. Moreover, Tenn. R. Crim P. 47 states that "[a] motion other than one made during a trial or hearing shall be in writing unless the court permits it to be made orally. It shall state with particularity the grounds upon which it is made

and shall set forth the relief or order sought." Clearly, Rule 47 gives the court discretion to hear oral motions. Written motions and affidavits serve a useful purpose in that they preserve the particulars of the issue to allow for suitable response by the opposing party and for review by the courts. A written affidavit and/or motion is not mandatory, however, and should not be an obstacle to review of a sufficiently developed issue as presented in the instant case. The interests of justice are particularly offended when the record reflects that the need for the continuance was not known until very late in the trial, that defense counsel did all that he reasonably could do to secure the witness' presence, and the trial court did not base its denial on the oral nature of the request.

The State further contends that the baseless representations made by defense counsel regarding the unavailable witness, Ms. Hooks, left the trial court with little choice but to deny Defendant's request and proceed with trial. In support, the State points out that when defense counsel was confronted with requests for proof concerning the medical status of the unavailable witness, he presented no information regarding either the nature of the witness' medical problem or when, if ever, the witness would eventually be available to testify. According to the record, the trial judge had the following discussion with defense counsel regarding Hooks:

> THE COURT: I think I advised you earlier that if you could bring to the Court something from a doctor or hospital or something saying that this particular witness is unavailable because of these medical diagnoses which confine her to her apartment, then the Court will consider that. But you have brought nothing. All I have –
>
> MR. FELKNER [Defense counsel]: I can't produce –
>
> THE COURT: I understand that, but I'm putting it on the record just like you put it on the record earlier. I cannot, under those circumstances, continue a trial based upon hearsay from somebody else saying that she is confined to the apartment, and nothing else is available – no medical diagnosis. You can't tell me that she has got a life-threatening disease. You can't tell me that she can't walk. You can't tell me anything, except that she's not here.

The trial court thereafter denied Defendant's motion for a continuance. Apparently, the trial court wanted proof that the witness was, in fact, unavailable. While we concede that the trial judge could not grant an unending continuance and the trial court's request for proof was reasonable, defense counsel nevertheless would require *some* period of time to comply with the court's demands. It is obvious that Defendant was surprised when the witness was not present in court. It is not unreasonable for Defendant to expect the trial court to provide him with a day or so to investigate the nature of the witness' illness, talk to the doctors and the witness, and/or devise an alternative plan, if necessary, to present this important testimony to the jury. Yet the trial judge refused "to hold up the trial for one person when there has already been at least one other witness testifying," even

though Defense counsel pointed out that the person the judge referred to as the "other witness" was, in fact, not even present during the alleged assault.

The trial court also refused Defendant's request for a warrant to send officers to bring Hooks into court. The judge explained that although the missing testimony would probably be helpful to Defendant's case, the judge would not put the court "in the position of dragging somebody out of their apartment when a doctor has confined them..." until she had more information regarding the witness' state of health. This decision is prudent, but we are perplexed when we consider the denials of Defendant's two requests in conjunction with one another. The trial court needed proof of the witness' medical problem to grant a continuance on the one hand, but contemporaneously denied Defendant's request for a warrant because the witness' medical condition might be too serious for her to be moved. The bases for the trial court's denials contradict one another.

It is also significant to note that Defendant was diligent in his efforts to secure the crucial testimony of Hooks: the subpoena was obtained and served in timely fashion, defense counsel spoke with Hooks at the commencement of trial and received assurance that she would appear, Defendant visited Hooks at her home on the eve of her testimony to offer her a ride to court, and defense counsel tried to call her to discover the details of her illness but her phone had been disconnected. When these efforts proved unsuccessful, Defendant requested the trial court to grant him a continuance and/or warrant. Finally, Defendant made an offer of proof for purposes of this appeal. As a practical matter, there was little else Defendant could do to produce Hooks or provide the trial court with more information without additional time. Defendant acknowledges that a reluctant or temporarily unavailable witness can work a great inconvenience upon a trial court. However, he cites Hughes in his brief for the contention that "sanctions should fall upon the witness, not a diligent defendant who was legitimately exercising his right to compulsory process for obtaining a witness material to his defense." Hughes, 1993 WL 193712 at *4.

Lastly, the State contends that the witness' testimony would merely constitute a repetition of facts that had already been testified to at trial. Indeed, the record shows that the trial judge determined that Hooks' testimony was redundant and therefore, unnecessary. During Defendant's first request for a continuance the trial judge stated:

> [t]here has been one witness that has already testified who was an eyewitness to the entire episode. It's my understanding that Mr. Mitchell is also going to testify, and *unless there were extenuating circumstances such that there were – this is the only key witness out there to testify*, then I can't see ordering this individual to come to court .... (Emphasis added.)

We disagree with the trial court's determination that Hooks' testimony was unnecessary as a mere repetition of facts already in the record. As defense counsel pointed out, Hooks was not simply an eyewitness to what happened at the time of the alleged assault. In fact, Hooks was the *only* witness who could testify as to what happened other than the victims and Defendant. The other

"eyewitness" missed the shooting incident entirely. Hooks' rendition of what occurred was the sole account of the alleged crime from a disinterested unbiased viewpoint and, if it substantiated Defendant' story, it would become highly probative evidence. Because nothing else existed to corroborate Defendant's claim of self-defense, Hooks' testimony potentially carried substantial weight and the jury should have been allowed to hear the testimony.

We believe that the trial court's concern for expeditiousness in the proceedings interfered with Defendant's due process rights. In State v. Morgan we stated:

> A trial court should not summarily adhere to time schedules or prejudge the issue of a continuance. It should properly balance the potential harm to the state caused by a delay against the potential harm to the defendant caused by no delay, within the context of its duty to administer the criminal justice system within its circuit, including the control of its docket.

State v. Morgan, 825 S.W.2d 113, 117 (Tenn. Cr. App. 1991). The harm to Defendant which resulted from the trial court's refusal to delay the trial far outweighed any harm to the State. Indeed, the State did not argue that a delay would cause it inconvenience or that it would prejudice its case. In contrast, Defendant proved that the statement taken from Hooks was clearly crucial to the defense when he delivered a copy of it to the court. In sum, we hold that the denial of a continuance was an abuse of discretion and prejudicial to Defendant. As a result, Defendant was denied a fair trial as a different result might reasonably have been reached if the continuance had been granted.

Although the issue of sentencing was not raised on appeal, we observe that the trial court erred in the judgment concerning Defendant's sentence. Under Tennessee law, a standard Range I offender convicted of a Class C felony must be sentenced to a term of not less than three (3) nor more than six (6) years. See Tenn. Code Ann. § 40-35-112(a)(3) (1997). According to the judgment, Defendant was sentenced to a term of "6 months and 4 years probation," with the six months to be served in the Shelby County Workhouse followed by the four year period of probation. Apparently the trial court intended to order a sentence of split confinement pursuant to Tenn. Code Ann. § 40-35-306. If this is the case, the judgment must reflect that Defendant is sentenced to a term of years within the appropriate range, i.e., three (3) to six (6) years, with the manner of service comprised of a period of time served in split confinement not to exceed one (1) year of incarceration in the workhouse or local jail or the defendant's release eligibility date. See State v. John W. Hill, No. 01C01-9802-CC-00072, 1999 WL 92948, Franklin County (Tenn. Crim. App., Nashville, February 25, 1999). This may be followed with probation for a period of time up to and including the statutory maximum time for the class of the conviction offense. See Tenn. Code Ann. § 40-35-306 (1997). Defendant's present sentence is incorrect as it does not fall within the statutory mandate. However, since we have reversed and remanded Defendant's case, amending the judgment is unnecessary.

## CONCLUSION

The conviction is reversed, and the case is remanded to the trial court for a new trial.

_____
THOMAS T. WOODALL, JUDGE