# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 9, 2003 Session

## STATE OF TENNESSEE v. LEONARD FRANKLIN

### Direct Appeal from the Criminal Court for Shelby County
### No. 0006441    W. Fred Axley, Judge

### No. W2002-03008-CCA-R3-CD  - Filed October 30, 2003

A Shelby County jury convicted the defendant, Leonard Franklin, of simple assault.  The trial court sentenced him to seven months in the Shelby County Correctional Center with sixty days incarceration followed by eleven months and twenty-nine days probation.  On appeal, the defendant contends the trial court erred in: (1) denying the defendant's motion for a continuance; (2) limiting the defendant's cross-examination of the victim concerning her civil lawsuit against him; (3) admitting evidence of the defendant's suspension from his place of employment; (4) improperly commenting on the evidence; and (5) imposing a period of confinement.  We reduce the probationary term to ten months but otherwise affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed as Modified; Remanded

JOE G. RILEY, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JERRY L. SMITH, J., joined.

Michael F. Rafferty (on appeal), James R. Garts, Jr. (on appeal), and Jeff A. Crow, Jr. (at trial), Memphis, Tennessee, for the appellant, Leonard Franklin.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; William L. Gibbons, District Attorney General; and Eric Christensen, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant, an anesthesiologist, was convicted of assault by causing bodily injury to Mary Sue Rowland, an employee of the Ridgelake Ambulatory Center, on July 26, 1999.  James Pike, the Clinical Director of the center, testified that during the evening of July 26, he contacted the defendant because a patient required surgery.  Pike stated the defendant arrived at the center approximately one and one-half hours later.  When Pike informed the defendant that another patient, Jim Pearl, had been waiting for treatment, the defendant replied, "I'm the doctor, he'll wait another dam[n] hour if I want him to."

Pike stated that moments later, the defendant approached him and requested the patient's medical records. Pike informed the defendant that the victim had the key to the medical records office and gave him the victim's telephone number. Upon returning from calling the victim, the defendant stated, "[W]ell, I guess she'll get her fat ass up here now." He further said, "I called and told her to drop her dam[n] fork and get her fat ass up here and get me that chart."

Pike testified that when he saw the victim fifteen to twenty minutes later, she informed him that she had given the keys to Charlotte Dunaway to retrieve the chart. Pike told her to speak to her daughter, Ira Nell Rowland, who was the recovery room nurse, because she had requested to be relieved from working with the defendant that night. The victim indicated she would and then exited the room.

Pike stated he then heard the victim screaming for help. He ran into the hallway and observed the defendant standing over the victim, who had "cuts on her eyes." The victim, who was "crying and bleeding," stated the defendant attempted to "poke [her] in the eyes" and "blind" her. Pike testified the defendant then came towards the victim, and he moved in between the defendant and the victim. Pike stated he never saw the victim raise her hands toward the defendant or otherwise attempt to provoke him. He then identified photographs of the victim which depicted the injuries caused by the defendant.

Ira Nell Rowland, the victim's daughter and a registered nurse at the center, testified that on July 26, 1999, while she was speaking to two patients, the defendant approached and made several comments about the victim. The defendant appeared "very agitated" and commented about a chart. One of the patients told the defendant that they did not "need to be hearing all this."

Rowland stated the defendant returned to his desk and made a telephone call. During the telephone conversation, the defendant loudly stated, "[Y]ou need to put your little forky down and get your fat ass up here and get this chart." Rowland testified the defendant then "slammed" down the telephone and began "going off" about the victim. She approached Pike and requested he obtain a replacement for her for that night due to the defendant's behavior.

Rowland testified that upon returning to a patient, she observed the victim and the defendant engaged in a conversation in the recovery area. Rowland was able to observe the right side of the victim's face and the defendant's left hand. The victim asked the defendant, "[I]s there anything else I can get you?" Rowland testified the defendant then began "jabbing" at the victim's eyes. Prior to the incident, Rowland did not see the victim make any movements toward the defendant and did not hear her yelling at him. Rowland and Pike then separated the defendant from the victim. The defendant moved toward the victim again, but Pike stopped him. Rowland identified photographs of the victim's injuries.

Mary Sue Rowland, the victim and the manager of the outpatient surgery center, testified that on July 26, 1999, while she was eating dinner at her residence, the defendant called her and requested the key to the medical records office. When she asked the defendant if she could finish eating her dinner first, the defendant replied, "[Y]ou need to put your little forky down, get your fat ass up here and get me the chart." The victim stated she then called Dr. Louis Glazer, the

defendant's supervisor, and informed him of the defendant's comments. Dr. Glazer requested she bring the keys to the center and remind the defendant that he promised he would "behave" during Dr. Glazer's absence.

The victim stated she arrived at the center fifteen to twenty minutes later. The victim then gave the keys to Charlotte Dunaway, who worked in the medical records department, and requested she retrieve the chart. Pike then asked her to inform her daughter that another nurse was going to relieve her.

The victim testified she saw the defendant standing in the hallway with her daughter. The victim informed the defendant that someone was retrieving the chart. The victim stated she then approached the defendant and told him that she needed to speak to him. She testified that upon mentioning Dr. Glazer, the defendant shoved her with both of his hands with such force that her neck "popped" three to four times. The victim stated the defendant then began punching her eyes, and she was "blinded" for a moment. She further stated she threw her head back in order to move away from the defendant.

The victim testified that upon yelling for help, Pike and her daughter arrived. She stated the defendant continued to move toward her, but Pike stopped him. The victim testified she was not aggressive toward the defendant and made no derogatory remarks to him. She identified her injuries resulting from the attack in photographs, which were taken the next morning. The victim stated that after the incident, Pike cleaned her wounds, and she went to Dr. Glazer's residence where she received further treatment. She also sought treatment from another doctor the next morning. The victim testified she had permanent indentations under her eyes as a result of the incident.

Jim Pearl testified he was a patient at the center on July 26, 1999. He stated that he observed the defendant and the victim standing close to each other. Pearl further stated he was ten to fifteen yards away and the victim had her back to him. He testified he heard "a pop and another pop," and the victim's head "snapped back" after each "pop." Pearl stated that although he did not see the defendant strike the victim, he "heard what sounded like a hit and her head snapped back." He further stated that prior to the incident, he did not hear anyone yelling, and he did not observe the victim attempt to strike the defendant.

Dr. Louis Glazer, Chief Anesthesiologist and Medical Director at the center, testified that on July 26, 1999, while at his residence, he received a telephone call from the victim. He stated he instructed the victim to take the keys to the center and give the defendant the records which he requested. The victim and her daughter came to his residence later that evening. Dr. Glazer stated the victim was crying and her face was swollen. The victim informed the doctor that while she was speaking with the defendant, he attacked her, resulting in lacerations under both of her eyelids.

Dr. Glazer testified he examined the victim and observed swelling under her eyes and "some slits, one under each eye." He stated he provided her with an ointment to clean the wounds and ensured she received treatment the next day at an eye clinic.

Dr. Glazer testified he confronted the defendant at the center the next morning and informed him that he was suspended until the matter was resolved. When the defendant asked Dr. Glazer whether he wanted to hear his side of the story, the doctor stated the defendant had no justifiable excuse for placing his hands on the victim. Dr. Glazer testified the defendant did not deny placing his hands on the victim. The doctor stated that in conducting his investigation, he also spoke to Pike and "a few other people at the Surgery Center." Based upon his observations and his investigation of the incident, Dr. Glazer concluded the defendant struck the victim.

Sharon Harris, a registered nurse at the center, testified regarding a prior incident. Harris stated she placed a chart on a desk located near the exit of the recovery room. The defendant began shouting at her in a patient's presence and accused her of abandoning a patient. He then placed his hand in front of her face and stated, "I only tolerate you because you have cancer." Harris stated she then began to cry.

Dr. James T. Gaylon, an orthopedic surgeon, testified he performed surgery on the defendant on August 21, 1992, in order to repair a tear in his left rotator cuff. He stated that as a result of the injury and the surgery, the defendant found it difficult to raise his arm and rotate his arm forward and backward in extreme positions. Dr. Gaylon conceded he was not familiar with the extent of the defendant's limitations on the day of the July 26, 1999, incident.

Lisa Holiday and Carol Woods testified they saw the victim on the morning after the incident and did not observe any injuries on the victim's face.

Charlotte Dunaway, a surgery technician at the center, testified that on July 26, 1999, the victim appeared to be "[s]lightly irritated" and threw the keys to the medical records office at her. Dunaway stated that while walking to the medical records office, she observed the victim yelling at the defendant in the hallway. She further stated she never heard the defendant yelling and that he did not appear to be upset. Dunaway testified that when she later saw the victim, she observed red marks, which appeared to be fingernail prints, on the victim's cheeks, but she did not observe blood or bruising on the victim's face.

The defendant testified that on July 26, 1999, he received a telephone call from the victim, during which the victim used profanity. Later that same evening, he observed the victim walk out of the recovery room at the center and violently slam the door. The defendant stated the victim appeared "very, very angry," which concerned him because he had witnessed the victim's prior "outbursts of anger." The victim then aggressively approached the defendant and displayed "predatory malignant behavior." The defendant stated the victim came at him "almost nose to nose" and moved "in and out" of his face. He further stated the victim raised her left hand, and he put his hand up without extending his arm.

The defendant testified that by using two of his fingers, he "touched" the victim's face twice under her eyes. He stated the victim snapped her head back as a "reflex and avoidance thing." The defendant further stated that after he "touched" the victim, he observed two small indentations in the victim's makeup. The defendant testified the victim then stepped back and said, "Thank you, I'll own you," and then yelled for help.

The defendant testified he did not yell at the victim or push her. He stated he did not intend to cause bodily injury to the victim and denied causing the victim's injuries as depicted in the photographs.

The jury convicted the defendant of assault, a Class A misdemeanor. *See* Tenn. Code Ann. § 39-13-101(a)(1), (b). The trial court sentenced the defendant to seven months in the Shelby County Correctional Center and required him to serve sixty days in confinement followed by eleven months and twenty-nine days probation.

## I. DENIAL OF MOTION FOR A CONTINUANCE

The defendant contends the trial court erred in denying his motion for a continuance due to the unavailability of a material witness. We disagree.

### A. Trial Proceedings

On the morning of trial, the defendant moved for a continuance due to the absence of witness David Black.[1] The defendant argued Black was a material witness, whom he had unsuccessfully attempted to subpoena. The defendant stated he had been informed that Black had been "called up" with the Army Reserves. He requested a continuance in order to obtain a federal subpoena for Black. The trial court denied the motion, noting the defendant had many opportunities to find the witness.

During the hearing on the motion for new trial, the defendant argued that Black was a material witness because he was present when the incident occurred. In denying the motion for new trial, the trial court noted:

> I'm thinking about the number of times that we continued this case because he couldn't be located. And when he was located, the number of times we continued the case simply because you couldn't produce the witness.

### B. Analysis

The decision whether to grant a motion for a continuance is a matter of discretion for the trial court, the denial of which will not be overturned on appeal absent a clear showing the trial court abused its discretion to the prejudice of the defendant. State v. Melson, 638 S.W.2d 342, 359 (Tenn. 1982); Baxter v. State, 503 S.W.2d 226, 230 (Tenn. Crim. App. 1973). In order to establish an abuse of discretion, the complaining party must make a clear showing of prejudice as a result of the continuance being denied. State v. Teel, 793 S.W.2d 236, 245 (Tenn. 1990).

---

[1]The defendant's brief refers to the potential witness as "David Blagg." We use the spelling that appears in the transcript.

When seeking a continuance due to the unavailability of a witness, the defendant must file an affidavit alleging:

> (a) the substance of the facts the defendant expects to prove through the unavailable witness; (b) sufficient facts to establish the relevance and materiality of the testimony; (c) the admissibility of the testimony, if the witness was available; (d) the non-cumulative nature of the testimony; (e) the witness' availability at a later date; and (f) due diligence in attempting to obtain the presence of the witness.

State v. Zirkle, 910 S.W.2d 874, 884 (Tenn. Crim. App. 1995) (citations omitted). Generally, conclusory allegations or opinions alone are insufficient to support the granting of a continuance. State v. Bennett, 798 S.W.2d 783, 788 (Tenn. Crim. App. 1990).

In the case at bar, the defendant's motion was not accompanied by an affidavit setting forth the facts which he expected to prove through Black's testimony, sufficient facts to establish the relevance and admissibility of the testimony, and Black's availability as a witness at a later date. Further, the defendant merely asserted Black was present when the incident occurred and he had been unsuccessful in his attempts to subpoena Black. In denying the motion for new trial, the trial court noted the case had been continued on previous occasions in order to allow the defendant to procure Black as a witness and that such efforts had been unsuccessful. The trial court did not abuse its discretion in denying the defendant's motion for a continuance.

## II. CROSS-EXAMINATION OF THE VICTIM

The defendant contends the trial court erred in limiting his cross-examination of the victim regarding her civil lawsuit against him. He further maintains the trial court erred in refusing to admit a copy of her civil complaint into evidence. We disagree.

### A. Trial Proceedings

Prior to trial, the state moved in *limine* to limit evidence of the victim's civil lawsuit to the cross-examination of the victim and to prohibit the introduction of an enlarged copy of the civil complaint. The trial court permitted the defendant to question the victim regarding the lawsuit during cross-examination, but it prohibited the introduction of any "physical exhibits."

During direct examination, the victim testified she filed a civil lawsuit against the defendant on the advice of her attorney. During cross-examination, the victim stated she incurred approximately $98.00 in medical expenses as a result of the incident.

Defense counsel then attempted to question the victim regarding whether she had received treatment from a psychiatrist or a psychologist as a result of the incident. The trial court held a bench conference during which defense counsel explained that the victim had alleged severe emotional injury in her civil complaint. The trial court informed defense counsel that only "bodily injury" was required to support an assault conviction, and the extent of the victim's emotional injury

and the amount of medical expenses incurred were civil matters. Defense counsel then indicated, "That's fine. We won't go there." The trial court then instructed the jury:

> Ya'll understand this is a criminal case. You don't worry about what medical bills were incurred. Okay?

After being further questioned by defense counsel, the victim acknowledged she filed a civil lawsuit against the defendant for $500,000. The trial court then gave the following jury instruction:

> Sure. Again, ya'll don't need to be concerned about some $500,000–there's a time when I'll tell you about credibility or believability of a witness. And part of that is manner and demeanor on the witness stand, ability to answer the questions that are asked and *interest or lack of interest in the outcome of the trial*, sure. But other than that don't–don't get yourself in a civil mire, that's across the street over there. Okay?

(Emphasis added.) Defense counsel did not question the victim any further.

## B. Analysis

The propriety, scope, manner and control of the examination of witnesses is within the sound discretion of the trial court. State v. Humphreys, 70 S.W.3d 752, 766-67 (Tenn. Crim. App. 2001). Absent an abuse of discretion, we will not interfere with such rulings. State v. Harris, 839 S.W.2d 54, 72 (Tenn. 1992). The scope of cross-examination extends to "any matter relevant to any issue in the case, including credibility." Tenn. R. Evid. 611(b). A party may offer proof through "cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." Tenn. R. Evid. 616. In order to establish interest or bias, a witness for the state in a criminal case may be questioned regarding whether he or she has filed a civil lawsuit against the defendant as a result of the acts involved in the criminal case. State v. Horne, 652 S.W.2d 916, 918 (Tenn. Crim. App. 1983).

The defendant maintains the trial court erred in refusing to admit a copy of the victim's civil complaint into evidence. However, the defendant failed to make an offer of proof regarding the contents of the complaint and failed to include a copy of the complaint in the appellate record. As a result, we are unable to examine the contents of the complaint and determine which parts, if any, were admissible. Accordingly, this issue is waived. *See* State v. Robinson, 971 S.W.2d 30, 40 (Tenn. Crim. App. 1997) (noting that if the excluded evidence is not contained in, or apparent from, the record, the appellate court will not consider the issue). We agree that evidence that the victim filed a civil lawsuit against the defendant is relevant to establish bias; however, we note the trial court properly permitted defense counsel to question the victim regarding the lawsuit, and the victim admitted filing the $500,000 lawsuit. Therefore, based on the record before us, we are unable to discern the real need to introduce the civil complaint into evidence. Regardless, any error was harmless in light of the testimony about the lawsuit. *See* Tenn. R. App. P. 36(b).

The defendant next contends the trial court's limiting instructions to the jury effectively restricted the scope of his cross-examination of the victim regarding the civil lawsuit. However, the defendant failed to object to these instructions at trial. By failing to make a contemporaneous objection, a defendant waives appellate consideration of the issue. Robinson, 971 S.W.2d at 42-43; State v. Scott M. Craig, No. E2001-01528-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 730, at *18 (Tenn. Crim. App. Aug. 27, 2002, at Knoxville); State v. Lon S. Walker, No. 01C01-9711-CR-00535, 1999 Tenn. Crim. App. LEXIS 352, at *13 (Tenn. Crim. App. Apr. 16, 1999, at Nashville), *perm. to app. denied* (Tenn. 1999). Moreover, in examining the trial court's limiting instructions in their entirety, we are unable to conclude the trial court instructed the jury that the civil lawsuit was totally irrelevant. Rather, the trial court told the jury the lawsuit could relate to "interest or lack of interest in the outcome of the trial" as a means of determining credibility. This instruction about "interest or lack of interest in the outcome of the trial" was also reiterated in the trial court's final jury instructions relating to credibility of the witnesses. The defendant is not entitled to relief on this issue.

### III. EVIDENCE OF THE DEFENDANT'S SUSPENSION

The defendant maintains the trial court committed reversible error in permitting Dr. Glazer to testify regarding his suspension of the defendant following the incident. We discern no reversible error.

Prior to trial, the defendant requested that the trial court prohibit the introduction of evidence relating to his suspension of employment following the incident. The defendant argued the evidence was irrelevant; it was based upon hearsay; and its prejudicial effect outweighed any probative value. The trial court denied the motion, noting the defendant was merely suspended and not terminated from his employment.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Once the court concludes the evidence is relevant, the court should exclude the evidence if its probative value is substantially outweighed by its prejudicial effect. Tenn. R. Evid. 403; State v. James, 81 S.W.3d 751, 757 (Tenn. 2002). A trial court's decision as to the relevance of evidence under Rule 401 will be reversed only upon a showing of abuse of discretion. State v. Powers, 101 S.W.3d 383, 395 (Tenn. 2003).

We conclude Dr. Glazer's testimony regarding his investigation of the incident and his suspension of the defendant was irrelevant and was based upon hearsay information gleaned from statements made by others to Dr. Glazer. Therefore, the trial court erred in admitting this testimony.

Regardless, we conclude such error was harmless. As applicable to the case at bar, one commits "assault" who "[i]ntentionally, knowingly or recklessly causes bodily injury to another." Tenn. Code Ann. § 39-13-101(a)(1). The defendant admitted he "touched" the victim under her eyes. The victim stated she did not provoke the defendant prior to the incident. Ira Nell Rowland and Jim Pearl testified that prior to the incident, they did not see the victim attempt to strike the

-8-

defendant.  Rowland, Pearl, and James Pike stated they did not hear the victim yelling at the defendant.

Ira Nell Rowland and Pike testified they stepped in between the victim and the defendant, who continued to pursue the victim.  Dr. Glazer testified he observed the "slits" under both of the victim's eyes shortly after the affray.  Pike, Rowland, and the victim identified photographs of the victim's injuries as those caused by the defendant.  Our examination of these photographs reveals swelling and clearly identifiable red scratches or slits under both of the victim's eyes.

We further note that Dr. Glazer testified he spoke to the victim, Pike, and others during the course of his investigation.  We also note the victim, Pike, some of the employees, and a patient testified at trial.  Dr. Glazer further stated he did not listen to, and thus did not rely upon, the defendant's version of the events prior to rendering the suspension.  As noted above, at trial, the defendant admitted he "touched" the victim, but he claimed he did so in self-defense.  The photographs of the victim's injuries, which injuries the jury obviously concluded were not self-inflicted, belie the defendant's claims.  In light of these facts and circumstances, we conclude Dr. Glazer's testimony about the suspension was harmless.  *See* Tenn. R. App. P. 36(b).

## IV.  TRIAL COURT'S COMMENTS

The defendant maintains the trial court improperly commented during trial regarding the credibility of the witnesses and the evidence, and the improper comments constituted plain error.  We disagree.

### A.  Trial Proceedings

At the conclusion of the testimony of patient Jim Pearl, a witness for the state, the following colloquy occurred:

THE COURT:  Thank you, sir, you may step down.  You're free to go about your business.  Be careful.
THE WITNESS:  Well, thank you so much.  I enjoyed it, thank you.
THE COURT:  Come back to see us socially.
THE WITNESS:  I'll be happy to.
THE COURT:  Can't we all be nice like that?
DEFENSE COUNSEL:  Do what?
THE COURT: Why can't we all be nice like that?  Shakes the man's hand as he's leaving.  Maybe it's been set so many times he's on a first name basis with the Prosecutor, he calls him Eric.  He's a nice man.

Later during trial, the defendant testified at length regarding his private practice and his employment agreement with the center.  Defense counsel then interrupted the defendant:

DEFENSE COUNSEL: Doctor Franklin, going back to the issues of this case for one minute –
THE COURT: Thank you.

On cross-examination, the defendant testified he arrived at the center on time on the day of the incident. The prosecutor then questioned the defendant regarding Pike's testimony of his failed attempts to contact him. The following colloquy occurred:

Q: Had a hard time getting hold of you, didn't he?
A: That's what they say.
Q: They're lying about that?
A: I don't presume to make a comment about that.
Q: Are they mistaken about that?
A: I, again, don't presume to know what they were doing from their end.
THE COURT: Excuse me just a minute. Is this the Fifth Amendment?
DEFENSE COUNSEL: Sir?
THE COURT: Is this a Fifth Amendment?
DEFENSE COUNSEL: No.
THE COURT: Well, he's refusing to answer on some grounds. If we're getting into it, I need to advise him of his rights.
DEFENSE COUNSEL: No, you're not, we're not.
THE COURT: Ask him again.

The defendant then testified he believed Pike was mistaken.

There was no objection by defense counsel at trial relating to the comments of the trial court, nor was this issue raised in the motion for new trial. Thus, the issue is waived. *See* State v. Walker, 910 S.W.2d 381, 386 (Tenn. 1995); Lon S. Walker, 1999 Tenn. Crim. App. LEXIS 352, at *13.

## B. Analysis

Because the issue is waived, we now proceed to determine whether there was plain error. An error which has affected the substantial rights of a defendant may be noticed at any time in the discretion of the appellate court where necessary to do substantial justice. State v. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999). "Plain error" or "fundamental error" is recognized under Tennessee Rule of Criminal Procedure 52(b). State v. Adkisson, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). Some errors are so fundamental and pervasive that they require reversal without regard to the facts or circumstances of the particular case. Delaware v. Van Arsdall, 475 U.S. 673, 681, 106 S. Ct. 1431, 1436, 89 L. Ed. 2d 674 (1986).

There are five factors which must be present for a court to determine "plain error" exists:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused did not waive the issue for tactical reasons; and

-10-

(e)  consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (citing Adkisson, 899 S.W.2d at 641-42). Complete consideration of all five factors is unnecessary if at least one is absent. *Id*. at 283. Furthermore, the plain error must be such that it probably changed the outcome of the trial. Adkisson, 899 S.W.2d at 642.

A trial court has the inherent power to supervise and control its own court proceedings. State v. Cazes, 875 S.W.2d 253, 260 (Tenn. 1994). However, the trial court must take care not to convey to the jury an appearance of taking sides. *See* State v. Suttles, 767 S.W.2d 403, 407 (Tenn. 1989); State v. Brown, 823 S.W.2d 576, 588 (Tenn. Crim. App. 1991). Therefore, the trial court is prohibited from commenting upon the credibility of a witness or upon the evidence presented at trial. Suttles, 767 S.W.2d at 406.

The defendant contends the three incidents described above, as well as the trial court's instruction to the jury regarding the victim's civil lawsuit, effectively denied him a fair trial. While we do not condone the comments at issue, we are unable to conclude that the trial court's comments affected the verdict in this hard-fought four-day trial. *See* Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a). Accordingly, in examining the record in its entirety, we conclude the trial court's comments did not affect the "substantial rights of the accused" and consideration of the alleged error is not "necessary to do substantial justice." Tenn. R. Crim. P. 52(b); Smith, 24 S.W.3d at 282. Therefore, the trial court's comments do not rise to the level of plain error.

## V.  SENTENCING

The defendant contends the trial court erred in imposing a sentence of split confinement. We disagree.

### A.  Sentencing Hearing

At the sentencing hearing, Mary Sue Rowland, the victim, testified she felt humiliated and degraded as a result of the incident. She stated that after the incident, she has found it difficult to interact with professionals on a "one-on-one" basis.

Betty Conrad testified she has known the defendant for fifteen years and worked for him at the center. She stated the defendant was "good" with his patients. She further stated she never experienced any problems with the defendant, and she was unaware of any problems between the defendant and other employees. Conrad testified she was not present when the offense occurred.

The defendant testified he was sixty-one years old at the time of the hearing. He stated he graduated from medical school at the University of Tennessee and received his medical license in 1969. He also maintained his own practice, which focused on the area of pain management.

The defendant testified he suffers from chronic congestive heart failure. He stated he was hospitalized in February 2000 as a result of his condition, and although his condition has been

stabilized through medication, he is only able to work approximately two hours per week. The defendant testified he has a form of narcolepsy, and due to a prior rotator cuff injury, he suffers from residual muscle weakness, arthritis, and chronic pain.

The defendant expressed his regret regarding his involvement in the incident, but he maintained he "had every right to defend [himself] and suspect injury to [himself]." He stated he could not "assume responsibility for anything other than defending [himself]." He further stated he believed he should be acquitted of the charge.

The defendant testified that in February 1997, he was arrested for DUI and public intoxication and was later convicted of DUI. He stated that in November 1998, he was charged with reckless endangerment with a deadly weapon, and the charge was later expunged from his record.

In sentencing the defendant, the trial court noted the circumstances of the offense were "unique" in regard to the place where the offense occurred and the people who were involved. The court then characterized the offense as one involving violence in the workplace. It also noted it considered the "deterrent effect in the medical community" in sentencing the defendant.

The trial court sentenced the defendant to seven months in the Shelby County Correctional Center. The court ordered the defendant to serve sixty days in confinement followed by eleven months and twenty-nine days probation.

## B. Misdemeanor Sentencing

Misdemeanor sentencing is controlled by Tennessee Code Annotated section 40-35-302, which provides in part that the trial court shall impose a specific sentence consistent with the purposes and principles of the 1989 Criminal Sentencing Reform Act. *See* State v. Palmer, 902 S.W.2d 391, 393 (Tenn. 1995). The trial court retains the authority to place the defendant on probation either immediately or after a time of periodic or continuous confinement. Tenn. Code Ann. § 40-35-302(e). We further note that the trial court has more flexibility in misdemeanor sentencing than in felony sentencing. State v. Troutman, 979 S.W.2d 271, 273 (Tenn. 1998). When a defendant challenges the sentence, this court conducts a *de novo* review with a presumption the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d).

The defendant submits the trial court erred in failing to grant judicial diversion. *See id.* § 40-35-313(a)(1)(A) (Supp. 1999). However, the defendant failed to request judicial diversion during the sentencing hearing. This issue is waived. *See* State v. Donnie Thompson, No. M2002-01499-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS 178, at *8 (Tenn. Crim. App. Mar. 3, 2003, at Nashville); State v. David E. Smith, Jr., No. 01C01-9805-CR-00224, 1999 Tenn. Crim. App. LEXIS 573, at **11-12 (Tenn. Crim. App. June 9, 1999, at Nashville). Furthermore, according to the presentence report and the defendant's testimony, he has a previous conviction for DUI, a Class A misdemeanor. *See* Tenn. Code Ann. § 55-10-403(a)(1). An accused is eligible for judicial diversion only if he or she "[h]as not previously been convicted of a felony or a Class A misdemeanor." *Id.* § 40-35-313(a)(1)(B)(i)(c) (Supp. 1999). As a result, the defendant is not qualified to receive judicial diversion.

The defendant next maintains the trial court erred in denying total probation. The defendant has the burden of establishing suitability for total probation. *Id.* § 40-35-303(b); State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). A defendant seeking total probation bears the burden on appeal of showing the sentence imposed is improper, and that total probation will be in the best interests of the defendant and the public. State v. Baker, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997).

We initially observe that the record does not contain any evidence that there was a need for "deterrence in the medical community." *See generally* State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). Nevertheless, we conclude that the defendant has not met his burden of establishing his entitlement to total probation. The trial court properly considered the nature and circumstances of the offense in which the defendant, a doctor, attacked the victim, a fellow employee, during a dispute while at their place of employment in the presence of fellow employees and one or more patients. *See* Tenn. Code Ann. § 40-35-103(1)(B). We further note that while the defendant expressed regret regarding his involvement in the incident, he continued to maintain he acted in self-defense. Furthermore, the defendant's testimony at the sentencing hearing regarding his belief that he should be acquitted of the charge negatively reflects upon his potential for rehabilitation. *See id.* § 40-35-103(5); *see also* State v. Zeolia, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996) (considering a defendant's failure to accept responsibility in determining whether to impose probation or confinement). We also note the trial court expressly questioned the defendant's credibility at the hearing. *See* State v. Nunley, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999) (holding untruthfulness is a proper consideration). The trial court was in a much better position than this court to make this determination. Most significantly, we also note the defendant had a prior criminal conviction for DUI about fourteen months before the instant offense. We are unable to conclude the trial court erred in imposing sixty days of incarceration.

## C. Illegal Sentence

The defendant was convicted of assault by causing bodily injury, a Class A misdemeanor. *See* Tenn. Code Ann. § 39-13-101(a)(1), (b). The maximum term of imprisonment for a Class A misdemeanor is eleven months and twenty-nine days. *Id.* § 40-35-111(e)(1). In State v. Watkins, 972 S.W.2d 703, 705 (Tenn. Crim. App. 1998), this court held a defendant, who was convicted of a Class A misdemeanor and was entitled to five months and eight days of jail credit, could not receive a probationary term of eleven months and twenty-nine days. *See also* State v. Vito Summa, No. 02C01-9411-CR-00254, 1995 Tenn. Crim. App. LEXIS 1001, at **6-7 (Tenn. Crim. App. Dec. 28, 1995, at Jackson). Thus, a trial court may not impose upon a Class A misdemeanant a period of probation which, when combined with the time of confinement, exceeds eleven months and twenty-nine days. Watkins, 972 S.W.2d at 705.

In the case at bar, the trial court sentenced the defendant to seven months in the county jail and ordered him to serve sixty days of that sentence followed by eleven months and twenty-nine days probation. We conclude the trial court erred in imposing a sentence beyond the authorized maximum term of eleven months and twenty-nine days. Therefore, we reduce the period of probation to ten months.

## VI. CONCLUSION

In summary, we reduce the term of probation to ten months and remand for entry of a corrected judgment reflecting this modification. We otherwise affirm the judgment of the trial court.

_____
JOE G. RILEY, JUDGE