# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 2, 2008

## VICTOR L. POWELL v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Madison County**
**No. C-06-370     Roger Page, Judge**

**No. W2007-01068-CCA-R3-PC  -  Filed September 21, 2009**

After a trial by jury, Victor L.  Powell, the petitioner, was convicted of vehicular homicide by intoxication and three counts of vehicular assault.  He now appeals the denial of post-conviction relief.  Upon our review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ, joined.

Joseph Tilton Howell, Jackson, Tennessee, for the petitioner-appellant, Victor L. Powell.

Robert E. Cooper, Jr. Attorney General and Reporter Renee Turner, Assistant Attorney General; James "Jerry" Woodall District Attorney General; and Anna Banks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The facts of the underlying convictions, as outlined by this court in the petitioner's direct appeal, are described below:

On the evening of April 23, 2003, twelve members of the Vilonia United Methodist Church left Vilonia, Arkansas to attend the Icthus Christian Music Festival in Kentucky.  The group, which was traveling in two separate vehicles, a GMC Yukon and a church van, stopped briefly in Memphis before continuing east on Interstate 40. Near Jackson at mile marker 71, a trailer pulled by the Yukon, the second in the caravan, was struck by the defendant's vehicle. Marc Townsend, the driver of the Yukon lost control and the vehicle flipped four times before coming to rest on the westbound side of the interstate. Several passengers were ejected and one later died. The defendant was arrested for his role in the accident. The defendant was charged with three counts of vehicular assault for the injuries to Marc Townsend, Charles Himmler, and Scott Cordova. He was also charged with vehicular homicide

by recklessness and by intoxication for the death of Keith Townsend and with two separate counts of driving under the influence.

At trial, Charles Coker, a member of the church, testified that the youth group had planned the trip to Icthus for several months. Coker testified that the other adults attending the festival were Lisa Johnson, who was the youth director, and Marc Townsend and that the teenagers making the trip were Jessica, Sara, and Katie Coker, Addie Wells, Erica Wyatt, Scott Cordova, Kayley Johnson, Keith Townsend, and Charles Himmler. Coker recalled that the group left the church at approximately 8:00 p.m. on the evening of the accident. Because the music festival was a camping event, the group packed all their camping gear onto a fourteen-foot, single-axle trailer that was attached to the Yukon. According to Coker, Erica Wyatt, Addie Wells, and the three Coker girls were riding in the church van while Ms. Johnson and the remaining teenagers were with Marc Townsend in the Yukon.

Coker testified that the group stopped approximately forty minutes prior to the accident for gas, snacks, and a restroom break before continuing eastbound on Interstate 40. He stated that the Yukon was in the lead and that the van followed approximately one hundred feet behind. Coker recalled that somewhere near mile marker 70, a blue or black sedan passed his vehicle in the left lane, drifted toward the Yukon, and then struck the left rear of the trailer. Coker testified that the car then "jerked back to the left real hard." He stated that when the car struck the trailer, "it just knocked it sideways." According to Coker, the Yukon then swerved and rolled over three or four times before coming to rest in the westbound lanes of the interstate. Coker related that he directed his daughter to use her cellular telephone to call 911, grabbed a flashlight, and found the trailer, which had come unhitched, as well as Himmler and Kayley Johnson in the median strip. Coker described both Himmler and Kayley Johnson as injured but conscious. He recalled that Keith Townsend, who was lying in the middle of the roadway, was conscious but not coherent. Coker remembered that after hearing Ms. Johnson shout that she could not find Cordova or Marc Townsend, he found the badly injured Marc Townsend was trapped inside the Yukon. Coker recalled that Marc Townsend's scalp had been essentially peeled away from his skull. He stated that Cordova, who was some forty feet away from the vehicle, had "massive facial injuries."

Coker testified that when the ambulance arrived, he directed EMS workers to Keith Townsend first because he "didn't think Marc had a chance" and that despite the efforts of the EMS workers, Keith Townsend died at the scene. Coker stated that after being freed from the vehicle, Marc Townsend was transported by helicopter to the nearest hospital while the others were transported by ambulance. Coker recalled that he saw the defendant after the accident but did not speak to him.

Lisa Johnson, the youth director, testified that Marc Townsend was driving the Yukon and that she was in the front passenger seat. She recalled that Keith Townsend was just behind her seated next to Charlie Himmler and that her daughter, Kayley, was in the back seat with Scott Cordova. She remembered that at midnight, everyone sang "Happy Birthday" to Keith Townsend, ate ice cream, and then settled down to sleep. Ms. Johnson testified that approximately fifteen minutes later, she felt a "huge jolt" that felt like they had been struck by a "semi," the trailer fish-tailed, and then Marc Townsend lost control of the vehicle. According to Ms. Johnson, the Yukon flipped at least four times before coming to rest on the other side of the interstate. She remembered that Marc Townsend, who had been thrown over the console onto her leg, was very badly injured and that the other occupants had been thrown from the vehicle.

Ms. Johnson recalled crawling out of the window and finding her daughter and Himmler in the median. She related that Keith Townsend, who later died at the scene, was lying in the roadway and that Cordova, whose face had been "mutilated," was lying closer to the vehicle. According to Lisa Johnson, she saw the defendant and a companion at the scene and later saw the defendant at the hospital. She described the defendant, who was in handcuffs, as belligerent.

Marc Townsend testified that he has no recollection of the accident or the month following it. He stated that he received severe injuries in the accident, including a traumatic head injury and a broken hand. According to Townsend, the head injury had residual effects on his memory, speech, and movement. He recalled that he was hospitalized for approximately two months, that he required physical therapy for five weeks, that he had a permanent loss of hearing, and that he had to learn how to speak and walk again after the accident.

Sixteen-year-old Charlie Himmler testified that he was nearly asleep in the Yukon when he "was jarred very violently." He stated that he remembered little about the accident but knew he suffered a concussion, a broken collar bone, and numerous lacerations and abrasions.

Scott Cordova, also sixteen years of age, testified that he could not remember anything about the accident. He stated that he suffered five broken bones in his face, a "blown orbit," a closed head injury, and two broken arms. Cordova testified that he received home-schooling for the remainder of the year.

Scott Sanders, paramedic for the Jackson Medical Center EMS, testified that he and his partner, Tommy Parchman, who were the first to arrive on the scene, found "debris scattered all over the westbound lanes of I-40." He recalled that a bystander waived them over to examine Keith Townsend, who took his last breath as they rolled him over onto his back. Unable to revive Keith Townsend, Sanders and Parchman moved to Marc Townsend, who was trapped inside the Yukon and bleeding from a massive head injury. Sanders related that they pushed Marc Townsend back into the Yukon, placed a collar around his neck to stabilize his spine, and applied direct pressure to the "scalping" wound on his head. Sanders confirmed that the "jaws of life" were used to free him from the vehicle before he was transported by helicopter to the hospital.

Dr. John Campbell, a neurosurgeon, testified that Marc Townsend had "multiple injuries to his face, a large scalp laceration ... [and] severe facial swelling." A CT scan revealed "multiple facial fractures" as well as "bruising on the left frontal portion of his brain, and ... a collection of blood between the covering over the brain and the brain itself." Dr. Campbell stated that Townsend was given a sedative and admitted into the intensive care unit, where he stayed for nine days before being transferred to Baptist Hospital in Little Rock, Arkansas.

Dr. Jimmie W. Kee, a plastic and reconstructive surgeon who examined Cordova in the intensive care unit testified that Cordova had "fairly severe" abrasions and gouges over his entire face. He stated that "[b]oth of [Cordova's] eyes were completely swollen." According to Dr. Kee, Cordova suffered a displaced fracture of his nose and a "blow-out" fracture of the left orbit bone, which could affect his ability "to move his eye properly."

Dr. David Roberts, an assistant medical examiner who examined the body of Keith Townsend testified that the cause of death was "multiple blunt trauma to [the] abdomen and chest," "secondary to [a] motor vehicle accident." He stated that no autopsy was performed.

Claude Cain of the Tennessee Highway Patrol, who was the first Trooper to arrive on the scene, testified that both the eastbound and westbound lanes of the interstate were blocked with debris from the accident. Trooper Cain recalled that the defendant admitted being the driver of the 1993 BMW but was unable to produce a driver license or registration for the vehicle. The officer testified that when he noticed an odor of alcohol on the defendant and observed a small, brown bottle of liquor in the floorboard of the driver's side, he placed him in the back seat of the patrol car. According to Trooper Cain, the right front fender of the defendant's vehicle was

severely damaged, the windshield on the passenger's side was shattered, and the driver's side airbag had deployed. He testified that when he returned to his patrol car, he noticed a strong odor of alcohol. Trooper Cain described the defendant as "arrogant" and confirmed that he refused to submit to a blood test. Trooper Cain stated that he placed the defendant under arrest for vehicular homicide and transported him to the hospital so that blood could be drawn. According to the officer, the defendant became combative when they reached the hospital at approximately 3:00 a.m. and refused to cooperate. Restraints were used to immobilize the defendant while blood was drawn. Trooper Cain testified that he witnessed the drawing, labeled the blood, and, on the following day, transported it to the TBI laboratory in Memphis.

Wilma Taylor, a phlebotomist at Jackson General Hospital, testified that she drew blood from the defendant at the request of Trooper Cain. She confirmed that she gave the blood directly to the officer. Robert Marshall, a forensic scientist with the TBI, tested the sample and determined that the defendant's blood alcohol content was .1066 %.

Molly Greer, an employee of Wilhite's Truck Stop, testified that the defendant, who was a regular customer at the truck stop, came into the store on the evening of the accident to pick up a money order. She described the defendant as loud, appearing drunk, and smelling of alcohol. She testified that the defendant showed her his driver license when he cashed his check and that she forgot to return it.

Trooper Barry Waldrop, an expert in accident reconstruction, testified that he took several photographs of the scene and marked the area with orange fluorescent paint so that he could return during the day to take measurements. He recalled that the Yukon was severely damaged and that the defendant's BMW had damage to the right front fender area. Trooper Waldrop stated that he observed a "skid mark emanating from the right front tire [of the BMW] that led backwards back down the eastbound lane" and a gouge mark caused by the deflated tire. He testified that he was able to find the "common point" where the two vehicles collided, which was in the eastbound lanes. Trooper Waldrop determined that the distance from the common point to the location where the BMW came to rest was more than five hundred feet. Trooper Waldrop, who went to the hospital where the defendant and the victims had been taken, testified that he took photographs of Cordova and Himmler but was unable to photograph Marc Townsend due to the extent of his injuries. He stated that when he attempted to photograph the defendant, the defendant "lashed out" at him and "became physical and started fighting,

twisting, turning his head, . . . trying to . . . keep his face from being photographed." According to Trooper Waldrop, the odor of alcohol in the room where the defendant was being held was "very pungent." He described the defendant's demeanor as "extremely loud and boisterous" and remembered the defendant "screaming that his rights were being violated, his constitutional rights, his civil rights were being violated."

Trooper Waldrop, who returned to the scene of the accident with Trooper Max Anderson in order to continue his investigation, testified that he took measurements, created a topographical map of the scene, and then went to the wrecker yard to examine the two vehicles. Trooper Waldrop stated that he discovered a 50 milliliter bottle of Godiva Cappuccino liquor and an empty bottle of Skye Blue Malt Liquor in the defendant's BMW. He testified that Marc Townsend's wife, Debbie, gave him permission to remove the airbag module from the Yukon to assist in the investigation. Trooper Waldrop, who used a computer program from the manufacturer of the module to download the information, stated that although the airbag on the Yukon did not deploy during the accident, "there was a severe enough jolt, [that] it woke the module up and it started storing data." He related that the data from the module indicated that during the five seconds before the crash, the Yukon was traveling at a speed of sixty-three miles per hour and that Marc Townsend was wearing his seatbelt.

Trooper Waldrop testified that after examining all of the information he had obtained during his investigation, he concluded that the post-impact speed of the defendant's vehicle was seventy-one miles per hour. He also determined that the point of impact between the defendant's vehicle and the Yukon's trailer occurred in the right lane of the eastbound side of the interstate. Trooper Waldrop was able to ascertain that the rpm speed of the Yukon just before the accident was consistent with the vehicle being on cruise control. He explained that because the post-impact speed of the Yukon was seventy-one miles per hour, he was able to determine that the defendant's vehicle would have had to have been traveling at least eighty-four miles per hour at the time of impact in order to have increased the speed of the Yukon by eight miles per hour. It was Trooper Waldrop's opinion that the defendant's vehicle struck the Yukon as the Yukon traveled in its own lane.

Dr. Kenneth E. Ferslew, a forensic toxicologist and an expert in toxicology and alcohol concentration, testified that when alcohol is ingested, it follows the "body water" into all the tissues and eventually crosses the blood brain barrier. According to Dr. Ferslew, when the cross-over occurs, the body identifies the alcohol as a foreign substance and immediately begins the process of elimination by exhaling, metabolizing, and urinating. Dr. Ferslew explained that the elimination

rate of alcohol is "17 milligrams per deciliter from our blood per hour." According to Dr. Ferslew, the defendant's blood alcohol concentration at the time of the crash was .145 %. He testified that even if the defendant consumed the alcoholic beverages that were found in his car after the accident, that would not have explained a blood alcohol concentration amount of .1066% at the time of testing.

Dr. Ferslew testified that at a blood alcohol concentration of .145%, the defendant would have demonstrated a loss of coordination, a loss of hand-eye control, a loss of sensibilities, a loss of attention span, and an alteration of his judgment. It was his opinion that the defendant's ability to operate a motor vehicle would have been impaired. Dr. Ferslew stated, however, that he could not determine with certainty the precise degree of the defendant's impairment.

The defendant testified that in the days prior to the accident he had been in Montgomery, Alabama, and had returned to the west Tennessee area for his cousin's wedding. He stated that after driving in from Alabama, he rested at his grandmother's house in Humboldt. The defendant claimed that on the afternoon before the accident, he had picked up his cousin, Jarvis Tyson, and returned to his grandmother's house to "counsel" Tyson. He contended that when he discovered that Tyson had brought liquor with him, he poured out the liquor and told Tyson he would have to leave. In a bizarre account of the events leading to the accident, the defendant claimed that he placed Tyson under "citizen's arrest" because Tyson was wanted by the police. The defendant, who asserted that he was a military police officer, explained that he initially turned Tyson into law enforcement officers at the Ramada Inn before eventually deciding to handle the matter himself. He claimed that the airbag on his BMW deployed when Tyson tried to steal his car while they were stopped at Wilhite's Truck Stop and the defendant "switch[ed] on" his "device." He testified that he asked a mechanic at Wilhite's to replace the airbag.

The defendant denied any involvement in the accident and claimed that because of his medical training, he was present at the scene to help the accident victims. He explained that he and his vehicle were taken there by a tow truck driver because "they" were redoing the tanks and needed to clear the truck stop of all vehicles. The defendant claimed that there was a tractor-trailer accident on the ramp leading to Wilhite's Truck Stop and that the truck "had seeped out fumes." He insisted that the tow truck driver transported him and his car to the scene of the Yukon accident because "[t]he only thing [his] car had to do was stay elevated to where the . . . air compensation, you know, could turn around and surmise itself to where it could, . . . get all the combustion and bubbles from out of the tire."

During cross-examination, the defendant asserted that the reason his blood test was positive for alcohol was because the phlebotomist "turned around and stuck the thing up [his] butt." He contended that his car was damaged in the tractor-trailer accident on the ramp near Wilhite's Truck Stop.

State v. Victor L. Powell, No. W2004-02375-CCA-R3-CD, 2005 WL 3447675, at *1 (Tenn. Crim. App., at Jackson, Dec. 13, 2005).

The jury convicted the petitioner of vehicular homicide by intoxication and three counts of vehicular assault. On direct appeal, this court affirmed the convictions. Id. at *8. On October 30, 2006, the petitioner filed a pro se petition for post-conviction relief, and an amended petition for post-conviction relief was later filed by the petitioner's post-conviction counsel. By order entered on April 16, 2007, the post-conviction court denied the petitioner's petition for post-conviction relief. The petitioner then filed a pro se notice of appeal on May 16, 2007, that was denied by this court. The Tennessee Supreme Court granted the petitioner's application for permission to appeal. On May 27, 2008, the supreme court vacated this court's order dismissing the appeal. On June 26, 2008, this court remanded the case to the trial court. On July 7, 2008, the trial court entered an order finding that the petitioner was indigent and appointing counsel.

The petitioner's appointed counsel filed a brief on the petitioner's behalf with this court on August 25, 2008. The petitioner argues the trial court erred in denying his petition for post-conviction relief and his motion to continue the post-conviction hearing. Following our review of the record, we affirm the judgment of the post-conviction court.

**Post-Conviction Hearing**. At the post-conviction hearing, the petitioner testified that two months before the accident he was shot in the skull and suffered from a physical brain injury. He stated that, consequently, his testimony at trial was significantly affected. The petitioner testified that the accident triggered his mental problems, and he was unable to understand the questions asked at trial. The petitioner also testified that immediately before the accident, his vehicle was struck by debris that fell from the tractor-trailer driving in front of his vehicle. The debris struck the petitioner's windshield and caused one of his tires to explode. The petitioner's air bag deployed, and a chemical from the air bag came into contact with the petitioner's face. The petitioner testified that while attempting to maneuver to the shoulder of the interstate, he struck the trailer of the Yukon driven by Marc Townsend. The petitioner stated that he did not see the trailer because it was low to the ground. The petitioner testified that his account of the accident at the post-conviction hearing could be corroborated by Jarvis Tyson, the sole passenger in the petitioner's vehicle. The petitioner stated that he had not seen Tyson since the accident despite a diligent effort to locate him.

The petitioner's trial counsel testified that in preparation for trial, the petitioner offered several different theories about the accident. Counsel stated that several of the proposed theories

were so incoherent or factually impossible that he questioned the petitioner's mental state. Counsel testified that he and the petitioner discussed the possible testimony of Tyson. Counsel warned that Tyson's testimony could be dangerous to the petitioner's defense because it would place the petitioner as the driver at the scene of the accident. The petitioner told counsel that one of his tires had blown; however, counsel testified that the petitioner said this occurred away from the scene of the accident. Counsel could not recall any discussion about a third vehicle being involved in the accident. Counsel was unsure of the petitioner's testimony at trial because of the different theories the petitioner had proposed. Counsel stated the petitioner insisted on testifying and appeared capable of testifying coherently at the trial. A jury-out hearing was held on the decision to testify during which counsel stated the petitioner was informed of his right to testify and the implications of his decision.

In a detailed written order denying relief, the post-conviction court determined that the petitioner had waived all of the issues presented in his pro se petition because he only presented evidence in support of the issues raised in his amended petition for post-conviction relief. The post conviction court also determined that (1) the petitioner's issues concerning causation had been previously determined by this court; and (2) that counsel exercised sound judgment by not calling Tyson as a witness. Accordingly, the post-conviction court found that counsel's representation was not deficient and that the petitioner suffered no prejudice.

**Standard of Review**. Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2006). Our supreme court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotations and citations omitted). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Id., see also T.C.A. § 40-30-110(f) (2006). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n. 3 (Tenn. 1992)).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> [T]he right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to 'reasonably effective' assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal citation and quotation omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Vaughn, 202 S.W.3d at 116 (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984) and Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. . . . [ and] a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

The petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below an objective standard of "reasonableness under prevailing professional norms." Id. at 369 (quoting Strickland, 466 U.S. at 688, 104 S. Ct. at 2065). The attorney's conduct "must be assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999); see also Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002). The attorney's conduct is evaluated from "counsel's perspective at the time" and should not be assessed by the "distorting effects of hindsight." Nichols, 90 S.W.3d at 587 (quoting Strickland, 466 U.S. at 689, 104 S. Ct. at 2065).

Deficient performance can arise from the attorney's failure to conduct appropriate investigations. The attorney "has the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. (quoting Strickland, 466 U.S. at 691, 104 S. Ct. at 2066). The Tennessee Supreme Court has stated that "[a]lthough a defendant's statements or confessions do not eliminate counsel's duty to investigate, the reasonableness of counsel's actions 'may be determined or substantially influenced by the defendant's own statements or actions.'" Id. (quoting Strickland, 466 U.S. at 691, 104 S. Ct. at 2066).

To prove that counsel's deficiency resulted in prejudice, the petitioner must establish "a

-10-

reasonable probability that but for counsel's errors the result of the proceeding would have been different." Goad, 938 S.W.2d at 370. "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. (quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068). The petitioner must "establish that the deficiency of counsel was of such a degree that it deprived the defendant of a fair trial and it called into question the reliability of the outcome." Nichols, 90 S.W.3d at 587 (citing Burns, 6 S.W.3d at 463).

I. **Denial of Petition for Post-Conviction Relief**. The petitioner contends the post-conviction court erred in denying his petition for post-conviction relief. In his brief to this court, the petitioner argues that counsel failed to: (1) adequately investigate the possibility of an intervening cause of the accident; (2) present the defense that the accident was the result of an intervening cause; and (3) call Jarvis Tyson as a witness at trial. For the first time on appeal, the petitioner also argues that counsel failed to advise or prepare the petitioner to testify on his own behalf. In response, the State argues that grounds (1) and (2) cannot be raised in a post-conviction proceeding because they were decided by this court on direct appeal when the petitioner asserted that the evidence at trial was insufficient to support his convictions. As to the petitioner's remaining issues, the State argues that post-conviction court properly denied the petitioner's petition for post-conviction relief because the petitioner failed to establish deficient performance and prejudice required for ineffective assistance of counsel.

As an initial matter, we have reviewed the issues raised in the petitioner's direct appeal. The issue of causation only addressed the petitioner's impairment and excessive speed. The direct appeal did not, however, discuss the possibility of an intervening cause. Therefore, we will address the issue alleging an intervening cause of the accident in this petition for post-conviction relief.

The petitioner alleges that the post-conviction court erred in denying his petition because counsel failed to adequately investigate the possibility of an intervening cause of the accident. The petitioner argues that his defense was prejudiced because evidence of an intervening cause would have negated the causation requirement. The petitioner relies on counsel's acknowledgment that he was told by the petitioner that one or more of his tires exploded before the accident. In response, the State contends that counsel's failure to investigate was reasonable given the petitioner's insistence that he was not present at the accident.

Here, the record shows that the petitioner insisted that he was not at the scene of the accident when it occurred. The petitioner informed counsel that one or more of his tires had exploded; however, the petitioner said that he was taken to the scene of the accident by a wrecker service. "Although a defendant's statements or confessions do not eliminate counsel's duty to investigate, the reasonableness of counsel's actions 'may be determined or substantially influenced by the defendant's own statements or actions.'" Nichols, 90 S.W.3d at 587 (quoting Strickland, 466 U.S. at 691, 104 S. Ct. at 2066). Based on our review of the record, the petitioner has not proven that counsel's failure to investigate the possibility of an intervening cause was deficient. He has also

failed to prove that he was prejudiced by counsel's failure to investigate an intervening cause or shown that further investigation would have produced evidence sufficient to negate causation. Accordingly, he is not entitled to relief on this issue.

Next, the petitioner argues the post-conviction court erred in denying relief because counsel did not raise the defense of an intervening cause of the accident. In his brief, the petitioner claims "[a]n intervening cause of the accident would have limited the culpability of the Petitioner and his responsibility in causing [the accident]." In response, the State argues the post-conviction court properly denied relief because evidence of an intervening cause would have directly impeached the petitioner's testimony that he was not at the scene of the accident when it occurred.

Here, counsel testified that he was not told by the petitioner that a third vehicle was involved in the accident, and the petitioner insisted that he was not at the scene of the accident when it occurred. As pointed out by the State, evidence of an intervening cause would have directly contradicted the petitioner's testimony. Additionally, other than the petitioner's own testimony, the petitioner has not shown that such evidence existed, or that such evidence would have been sufficient to negate the causation requirement. Accordingly, the petitioner is not entitled to relief on this issue because he has not shown that counsel's performance was deficient or prejudice as a result.

Next, the petitioner argues that the post-conviction court erred in denying his petition for post-conviction relief because counsel did not call Jarvis Tyson as a witness at trial. The petitioner claims that counsel's performance was deficient because Jarvis Tyson would have testified concerning the petitioner's tire problems, the traffic flow, and the effect of debris striking the petitioner's vehicle. The petitioner further contends that the absence of this purported testimony prejudiced his defense. The State argues that Tyson's testimony would have been detrimental to the petitioner because it would have contradicted the petitioner's testimony by showing the petitioner was driving his vehicle at the scene of the accident when it occurred.

In its order denying relief, the post-conviction stated:

> [Trial counsel's] testimony at the post-conviction hearing established that he considered calling Tyson as a witness at trial, but that he declined to do so for two reasons. First, Tyson's testimony would have established beyond doubt that Petitioner was the driver of the vehicle involved in the fatal collision. Second, Tyson's testimony would have directly impeached Petitioner's own testimony, during which he asserted that he was not present at the scene at the time of the collision, but that he and his vehicle were brought to the scene by a tow truck.

The record supports the findings of the post-conviction court. The petitioner has failed to demonstrate how counsel's decision not to call Jarvis Tyson was deficient or prejudice as a result.

-12-

Accordingly, the petitioner is not entitled to relief on this issue.

We decline to consider the petitioner's remaining ground of ineffective assistance of counsel because it was not included in his pro se or amended petition for post-conviction relief. There was also no evidence in support of the remaining ground presented to the post-conviction court. In this regard, we note that a petition for post-conviction relief "must contain a clear and specific statement of all grounds upon which relief is sought, including full disclosure of the factual basis of those grounds." T. C. A. § 40-30-106(d). In addition, Tennessee Supreme Court Rule 28, section 5(E)(4) provides that the post-conviction petition must contain "specific facts supporting each claim for relief asserted by [the] petitioner." Accordingly, we conclude the petitioner is not entitled to relief on this issue because he failed to comply with the rules governing post-conviction relief.

**II. Denial of the Petitioner's Motion to Continue the Post-Conviction Hearing**. The petitioner contends that the post-conviction court erred in denying his motion to continue the post-conviction hearing. He argues that a continuance would have provided additional time to locate Jarvis Tyson whose purported testimony would have supported an intervening cause defense. The State argues that the petitioner waived this issue by failing to comply with Tennessee Court of Criminal Appeals Rule 10(b). In the alternative, the State contends the post-conviction court did not abuse its discretion in denying the continuance.

The decision whether to grant a continuance "rests within the discretion of the trial court." State v. Morgan, 825 S.W.2d 113, 117 (Tenn.Crim.App.1991). The Tennessee Supreme Court has held that the reviewing court should "reverse the denial of a continuance only if the trial court abused its discretion and defendant was prejudiced by the denial." State v. Thomas, 158 S.W.3d 361, 392 (Tenn. 2005). An abuse of discretion is shown when "the failure to grant a continuance denied [the] defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted." Id. (quoting State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995)). In other words, this court will reverse a denial of a motion to continue only upon a showing that the petitioner "did not have a fair trial and that a different result would or might reasonably have been reached had there been a different disposition of the application for a continuance." Baxter v. State, 503 S.W.2d 226, 230 (Tenn.Crim.App.1973); see also State v. Hurley, 876 S.W.2d at 65; State v. Caughron, 855 S.W.2d 526, 534 (Tenn.1993); State v. Butler, 795 S.W.2d 680, 684 (Tenn.Crim.App.1990).

We conclude that the post-conviction court did not abuse its discretion in denying the petitioner's motion to continue the hearing. As an initial matter, we note that the petitioner failed to cite any authority in his brief in support of this issue. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." See Tenn. Ct. Crim. App. R. 10(b). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue. Id.; State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). Despite the petitioner's failure to cite to authority, we have reviewed the record and conclude

-13-

that the post-conviction court's action did not prejudice the petitioner or deprive him of a fair trial. Here, the petitioner failed to show how Jarvis Tyson's testimony would be material to obtaining post-conviction relief. Based on Jarvis Tyson's statement to the police, counsel testified that his testimony would have been detrimental to the petitioner's defense. At the post-conviction hearing, the petitioner admitted during cross-examination that Jarvis Tyson's testimony would have impeached his own trial testimony. In addition, the post-conviction court had previously granted a continuance for the purpose of locating Jarvis Tyson. The record does not show that the petitioner was prejudiced or denied a fair trial by the post-conviction court's action. Accordingly, the post-conviction court did not abuse its discretion in denying the petitioner's motion to continue.

**Conclusion.** Based on the foregoing, the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE